**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARK LAVERY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:23-cv-04737 |
| | ) | |
| v. | ) | |
| | ) | |
| UNDERDOG SPORTS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S 12(b)(6) MOTION TO DISMISS**

Christopher V. Langone
205 N. Michigan Ave., Suite 810
Chicago, IL 60601
312-720-9191
chris@langonelaw.com

## INTRODUCTION

In *Langone v. Kaiser*, 2013 U.S. Dist. LEXIS 145941 (N.D. Ill. Oct. 9, 2013), Judge Durkin held that "in order to allege a ripe claim under the Loss Recovery Act, (Plaintiff) must allege that a specific loser lost a certain amount and failed to bring a claim for that amount within six months." *Id.* at *11. Plaintiff has met this pleading standard. Plaintiff alleges that Erik Beimfohr ("Beimfohr") lost $1,025 to Underdog Sports on three specific wagers in July of 2022 on over-under proposition bet parlays. [First Amended Complaint ("FAC") at ¶¶ 86-87, 88-89, & 90-91]. Plaintiff also alleges that Beimfohr lost more than $50 to Underdog Sports but never sued Underdog Sports to recover that money. [FAC at ¶¶ 34 & 94].

 Under Illinois law, making wagers is considered gambling. Illinois prohibits "knowingly mak[ing] a wager upon the result of any game, contest, or any political nomination, appointment, or election, 720 ILCS 5/28-1(a)(2), and "knowingly possess[ing] any money which he has received in the course of a bet or wager." 720 ILCS 5/28-1(a)(5). For a wager to be exempt from the statute, it must be: "Sports wagering when conducted in accordance with the Sports Wagering Act [230 ILCS 45/1 *et seq*.]." It is undisputed that the sports wagering in this case was not conducted in accordance with the Sports Wagering Act because, among other reasons, Underdog Sports does not have an Illinois Sports Wagering license. [FAC at ¶¶ 10, 12, 23, & 25; *see also*, ¶¶ 13-23 (explaining the difference between black market, grey market, and legal operators)].

Underdog contends that it is entitled to an exemption from the gambling statute because the wagers are supposedly "[o]ffers of prizes, award or compensation to the actual contestants in [a] bona fide contest for the determination of skill, speed, strength or endurance or to the owners of animals or vehicles entered in such contest." 720 ILCS 5/28-1(a)(1). But Plaintiff pleads that Beimfohr lost "wagers," not a contest of skill. [FAC at ¶¶ 27, 53 & 86-91]. Against the house

wagers are not bona fide contests of skill. *See* Edelman, Marc, *Navigating the Legal Risks of Daily Fantasy Sports: A Primer in Federal and State Gambling Law*, 2016 U. Ill. L. Rev. 117 (2016).

Moreover, even assuming arguendo that somehow "skill" is required in guessing how many hotdogs a person can eat, it is still illegal gambling because it is played by means of the Internet. 720 ILCS 5/28-1(a)(12)(It is also gambling when a company "knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet or to make a wager upon the result of any game, contest, political nomination, appointment, or election by means of the Internet.") Even a game of skill for money on the Internet must comply with Sections (6), (6.1), (8), (8.1), and (15) of subsection (b) to be exempt from the Illinois gambling law.[1] The exemption relied upon by Underdog Sports at 720 ILCS 5/28-1(a)(1) does not apply to Internet games of skill or wagers. It is a cardinal principle of statutory construction that the more specific controls over the general. *Central Commercial Co. v. Commissioner*, 337 F.2d 387, 389 (7th Cir. 1964). This rule leads to the conclusion that Illinois, since 2021, Illinois only permits games for money by means of the Internet that are licensed and regulated lotteries, raffles, and sports wagering. The bona fide contest of skill exemption does not apply to Internet games. 720 ILCS 5/28-1(a)(12).

Defendant's reliance on *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 5 is misplaced. The current gambling statute was effective August 20, 2021. The *Dew-Becker* opinion was issued on April 16, 2020. Under current law, the game played by Mr. Dew-Becker and Mr. Wu would be gambling because it was played by means of the Internet and it did not comply with the Lottery law, the Raffles and Poker Run law or the Illinois Sports Wagering Act. Furthermore, the Illinois Gaming

---

[1]    Sections 6 and 6.1 are lotteries run by the Illinois lottery. Sections 8 and 8.1 are Raffles and Poker Runs licensed under Illinois law. Section 15 relates to sports wagering licensed under and conducted in accordance with the Illinois Sports Wagering Act. [See also, FAC at ¶¶ 73-78].

Board now also defines "fantasy sports" (like played in *Dew-Becker*) as a "combination wager." *See*, 11 Ill. Adm. Code 1900.1120(b)(2)(A)(ii), effective March 4, 2021. Therefore, *Dew-Becker v. Wu* is old law that has no application to this case. It is not a recent ruling. It is four years old and has been abrogated by the Illinois General Assembly's update of the gambling law, as well as regulations promulgated by the Illinois Gaming Board. Indeed, *Dew-Becker* noted the legislature was free to do this. 2020 IL 124472, ¶ 28 (2020) ("In so holding, we note that nothing in this opinion should be read as stating that regulation of DFS contests is unnecessary or inappropriate. That determination is for the legislature"). The legislature limited games of skill by means of the Internet to licensed and regulated games. The legislature also empowered the Illinois Gaming Board to create regulations. 230 ILCS 45/25-15 ("The Board may adopt any rules […] consider[ed] necessary for the successful implementation, administration, and enforcement of this Act").

Defendant argues, "Perhaps the greatest defect of the complaint is its abject failure to define what is fantasy sports under the law." [Motion at p. 12]. This is not true. Plaintiff alleges in paragraph 77 that fantasy sports are sports wagering. [FAC at ¶ 77]. The Illinois Administrative Code for the Illinois Sports Wagering Act ("ISWA") covers "fantasy sports" as a combination wager. [*See* Section 1900.1120 Prohibited Wagering Activity (prohibiting fantasy sports wagering on certain college athletes from Illinois)]. This is now the law of the land in Illinois. Effective May 31, 2023: "Notwithstanding any provision of law to the contrary, the operation of sports wagering is only lawful when conducted in accordance with the provisions of this Act and the rules of the Illinois Gaming Board and the Department of the Lottery." 230 ILCS 45/25-25. Therefore, any case law that insinuates fantasy sports is not a method of wagering is superseded by statute. Moreover, the regulation mentioning fantasy sports specifically was passed in June 2020, after *Dew-Becker* was decided in April 2020. [*See also*, FAC at ¶¶ 73-78]

**LEGAL ARGUMENT**

**A.    *Dew-Becker* does not govern the outcome of this case.**

Defendant claims that "*Dew-Becker*, which interpreted the exemption for games of skill under 720 ILCS 5-28-1(b)(2),[2] is dispositive of this case." [Motion at p. 7]. This is incorrect for six reasons. ***First***, as noted above, *Dew-Becker* has been superseded by statute and administrative code rules in sports wagering. The conduct of Defendant squarely falls with the current definition of gambling in 2023. Games of skill for money by means of the Internet in Illinois are limited to regulated lotteries, raffles, and sports wagering. ***Second***, *Dew-Becker* did not address liability under Loss Recovery Act for gambling under Section (a)(2) or Section (a)(5), as alleged herein. The Illinois Supreme Court *only* addressed liability under the "game of skill for money" provision in 720 ILCS 5/28-1(a)(1). Moreover, the Illinois Supreme Court limited its holding to the specific game of head-to-head fantasy basketball. 2020 IL 124472 at ¶ 28 ("We determine here only that the DFS contest *at issue in this case* does not fall under the current legal definition of gambling") (emphasis added). ***Third***, the Illinois Supreme Court has not held that all gambling labeled "DFS" is exempt from any regulation, fees, or taxes. ***Fourth***, proof of a statutory exception under Section (a)(2) and Section (a)(5) is Defendant's burden to allege and prove, not Plaintiff's obligation to plead around. [*See* § F, below]. ***Fifth***, *Dew-Becker* was decided after a trial, not on the pleadings. ***Sixth***, in *Dew-Becker* the Court cited studies,[3] which the Court claimed showed that the game at issue therein – i.e., head-to-head DFS basketball (different than

---

[2]    This is an affirmative defense that must by plead and proved by Defendant. *See* § F, below.

[3]    Daniel Getty et al., *Luck and the Law: Quantifying Chance in Fantasy Sports and Other Contests*, 60 SIAM Rev. 869 (2018) (the "Getty Study"); Brent A. Evans et al., *Evidence of Skill and Strategy in Daily Fantasy Basketball*, 34 J. Gambling Stud. 757 (2018) (the "Evans Study"); Todd Easton & Sarah Newell, *Are Daily Fantasy Sports Gambling*? 5 J. of Sports Analytics 35 (2019) (the "Easton and Newell Study").

the wagers made in this case) – was predominantly skill based. Notably, the majority was taken to task for this by dissenting Justice Karmeier, who called the reliance on studies "that are not found in the record or in either party's briefs" an "impropriety." 2020 IL 124472 at ¶ 35 ("Because the studies were not presented at any stage of this litigation, reliance on these studies raises "'concerns about witness credibility and hearsay normally associated with citations to empirical or scientific studies whose authors cannot be observed or cross-examined.").

Justice Karmeier was certainly correct, the studies were never submitted to adversarial examination. For instance, the Getty Study was funded by FanDuel and based on data provided by FanDuel. The Easton and Newell Study is authored by a manager at Sam's Club, and a lecturer in mechanical engineering who has written a diet book entitled: *The When Diet: Mathematically Optimizing Eating and Exercise for Weight Loss*. The Easton and Newell Study does not disclose its funding source, and does not discuss its limitations, a basic requirement of any competent academic article. And like the Evans Study, its conclusion was very modest. The Evans Study stated the conclusion thusly: "DFS is not a "pure" game of chance and that there is an element of skill." The Easton and Newell Study only compared human picks versus computer-generated random picks to conclude, DFS is "not pure chance." But the test is not whether something is "not pure chance," but whether skill predominates (*i.e.*, is more than 51%). Moreover, all of the studies dealt with traditional fantasy sports, not prop bets, as in this case.

Defendant's argument is far too facile. Defendant's argument proceeds thusly: *Dew-Becker* involved something FanDuel (the website operator) called "fantasy sports,"[4] which after

---

[4]     Even the advent of the term "daily fantasy sports" seems to arise from a careful effort to liken the company's products to something more akin to traditional fantasy sports and different from sports gambling during a time in which online sports gambling was nearly universally illegal in the U.S. *See* Edelman, Marc, *Navigating the Legal Risks of Daily Fantasy Sports: A Detailed Primer in Federal and State Gambling Law*, 2016 U, ILL. L. REV. 117 (2016).

a trial the court found in favor of defendant (notably, based on grounds that were thereafter rejected by the Supreme Court). Therefore, Defendant concludes, any game someone calls a "fantasy sports contest" is legal. This argument just does not follow. It elevates nomenclature over substance. This use of nomenclature (a/k/a "fluid categorization") to confuse courts and regulators is part of a strategy used by Underdog Sports and others called "regulatory arbitrage." See generally, Holden, John T., McLeod, Christopher M., and Edelman, Marc, *Regulatory Categorization and Arbitrage*: *How Daily Fantasy Sports Companies Navigated Regulatory Categories Before and After Legalized Gambling*, 57 AMERICAN BUSINESS LAW JOURNAL 113 (2020) (attached as **Exhibit 1**) (describing the strategy of "fluid categorization" – i.e., "categoriz[ing] [oneself] differently, to different audiences, at different times" – and how it can be used in "unfair, anti-ethical and abhorrent ways"). Underdog is running the same playbook as DraftKings and FanDuel, as Holden *et. al* explained:

> In the case of DFS, the product offered by DraftKings and FanDuel appears to resemble gambling more closely than it does traditional, full-season fantasy sports; but the two markets are treated vastly differently. Fantasy sports have historically been viewed as a healthy means of engaging with sports and friends. Some groups, such as the National Football League (NFL), even market versions of fantasy football to schools as a means of teaching students educational skills. By contrast, governments have traditionally viewed sports gambling as a pariah, costing society millions of dollars in social and productivity costs. DFS companies emerged somewhere in between the two extremes, advocating that they were akin to traditional fantasy sports, while at the same time building websites that more closely resembled gambling sportsbooks. DraftKings and FanDuel thus have primarily exploited the uncertainty of proper labels to apply to the fantasy sports borderlands between the presumably benign fantasy sports industry and the stigmatized, but rarely sanctioned, sports betting universe. [See Exhibit 1, at p, 9]

Holden, *et. al*, repeatedly identify Illinois as a state whose policy was circumvented by this "cat and mouse" game of regulatory arbitrage. [See Exhibit 1, highlighted sections]. They conclude that the form of regulatory arbitrage engaged in by DraftKings and FanDuel (and now Underdog) is "offensive to the principles of justice." *Id*. at 39. [*See also* FAC at ¶¶ 52-62].

Finally, it bears mentioning that the circumstances in *Dew-Becker* are very suspicious. As Defendant's counsel notes, he was the attorney in *Dew-Becker*. AmLaw100 firms like Dentons charge over $750 per hour on average. Using 120 hours as a reasonable estimate to perfect an appeal, the appeal would have cost at least $90,000. No rational person would spend $90,000 over a $100 dispute. Also, Mr. Wu did not file any briefs in opposition in the appeals court. Moreover, counsel recently discovered that Mr. Dew-Becker and Mr. Wu are now business partners in a sports gambling website. The Illinois Supreme Court had held that a collusive lawsuit is void, and "not binding on the public." *Green v, Huntsville Township High School*, 356 Ill. 216, 222 (1934); *Litvak v. Black*, 2019 Il App (1st) 181707, ¶ 25. [See also FAC at ¶¶ 65-72].

Plaintiff clearly states a claim with respect to the wagers lost by Beimfohr to winner Underdog Sports. Plaintiff should also be permitted to discover the identity of other Illinois losers and collect bounties related to those losses. Judge Durkin's reliance on the case *Robson v. Doyle*, 191 Ill. 566 (1901), to limit discovery in Loss Recovery cases, was clear error. First, *Robson* was a state law procedural decision that does not apply in federal court. Next, the Illinois Supreme Court and U.S. Supreme Court have abrogated the holding of *Robson*. A civil litigant does not have an absolute right to remain silent in modern jurisprudence like in *Robson,* in 1901. See *Braswell v. United States*, 487 U.S. 99, 110 (1988) (Corporation has a duty to produce corporate records that may be incriminating). Moreover, the Illinois Supreme Court essentially overruled *Robson v. Doyle* when it held that pre-suit discovery can be used in Loss Recovery actions in *Dew-Becker v. Wu. Dew-Becker v. Wu*, 2020 IL 124472, ¶ 16 (2020).

### B. Plaintiff Pleads a Plausible Claim for Lost Wagers won by Underdog Sports.

The touchstone test on a Rule 12(b)(6) motion is plausibility. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must take all the factual allegations in the complaint as true. *Id.* Plaintiff does more than recite a threadbare gambling loss by Beimfohr. Plaintiff includes pictures of Internet betting slips lost by Beimfohr to Underdog Sports. [FAC at ¶¶ 88-90]. These betting slip images demonstrate that Beimfohr made over-under proposition bet parlays.

720 ILCS 5/28-1(a)(2) provides, "[a] person commits gambling when he or she… (2) knowingly makes a wager upon the result of any game, contest, or any political nomination, appointment or election." "Wager" means a sum of money or thing of value risked on an uncertain occurrence. 230 ILCS 45/25-10. "Sports wagering" is defined as:

> accepting wagers on sports events or portions of sports events, or on the individual performance statistics of athletes in a sports event or combination of sports events, by any system or method of wagering, including, but not limited to, in person or over the Internet through websites and on mobile devices. "Sports wagering" includes, but is not limited to, single-game bets, teaser bets, **parlays**, **over-under**, moneyline, pools, exchange wagering, in-game wagering, in-play bets, **proposition bets**, and straight bets. (emphasis added). *Id.*

The betting slips all plausibly show that Beimfohr risked sums of money. He risked the sums of $500, $25, and $500 on the wagers, as demonstrated on the betting slips. The betting slips show that there were over-under wagers. The words "over" and "under" appear on the betting slips.

The betting slips also demonstrate that these were "proposition bets." A proposition bet, often referred to as a "prop bet," is a type of wager that focuses on a specific event or outcome within a broader context, typically in sports betting or gambling. Unlike traditional bets that revolve around the final outcome of a game or match, proposition bets are often based on specific occurrences or details within the event. A "player prop bet" focuses on the performance of individual players within a game or event. For example, you might bet on how many points a particular basketball player will score, how many passing yards a quarterback will accumulate, or

whether a specific player will score a touchdown. The betting slip shows that Underdog Sports set the propositions. For example, Underdog Sports set the proposition on Kai Jones in the NBA summer league game at 11.5 points. [FAC at ¶ 90].

The betting slips also show that these were "parlay" wagers. A parlay wager is a type of sports betting that combines two or more individual bets into a single bet. The key characteristic of a parlay is that all the bets within the parlay must be correct for the gambler to win. If any one of the bets in the parlay is incorrect, the entire parlay is considered a loss. On the basketball wager, Beimfohr needed both Moses Wright and Kai Jones to score over the proposition number set by Underdog Sports to win the parlay bet. These betting slips show that Beimfohr lost $1,025. Beimfohr never sued Underdog Sports to recover the money. Underdog Sports does not have an Illinois Sports Wagering license. These facts supported by the Underdog Sports betting slips and other relevant non-conclusory allegations state a plausible claim.

### C. Plaintiff plausibly alleges that there are other losses by Beimfohr and other Illinois gamblers.

This case provides the Plaintiff and his counsel the opportunity to relitigate part of *Langone v. Kaiser*, which does not bind this Court in any way, with respect to the case of *Robson v. Doyle*, 191 Ill. 566 (1901). In *Langone v. Kaiser*, Defendants did not cite to *Robson* in their Motion to Dismiss. That case was cited by Judge Durkin in his order dismissing the case. Plaintiff Langone, who is counsel for Plaintiff in this case, informed Defendants of an intent to appeal and the case was settled. So, Plaintiff never got a chance to address *Robson*. Moreover, in *Kaiser*, Judge Durkin did not have the benefit of the Illinois Supreme Court holding in *Dew-Becker*, or its explicit holding such information is discoverable. 2020 IL 124472, ¶ 16 (holding Supreme Court Rule 224 can be used in aid of Loss Recovery Act claims). *Robson* is a case about Illinois state law discovery from 1901. In *Robson*, the plaintiff sought a bill of discovery. This was not a loss recovery act

claim but purely a claim for discovery. In 1901, the Illinois Code of Civil Procedure had not yet even been passed. The Illinois Civil Practice Act which preceded the Illinois Code of Civil Procedure was passed in 1933. The modern equivalent of a bill of discovery is contained in Illinois Supreme Court Rule 224. Finally, and most importantly, procedural law from Illinois does not apply in federal court. Defendant decided to remove this case. The Federal Rules of Civil Procedure control discovery in this case. *Mossberger v. Kochheiser*, No. 14 C 7284, 2016 U.S. Dist. LEXIS 59955, at *9 n.2 (N.D. Ill. May 5, 2016). Therefore *Robson v. Doyle* could never apply in this case even were it not abrogated by *Dew-Becker.*

Moreover, a Rule 12(b)(6) motion is not an appropriate vehicle to deal with discovery objections. The issue is whether it is plausible that there are other Illinois losers. The issue is whether it is plausible that Beimfohr, a professional gambler, lost other prop bets to Underdog Sports. The answer is yes. These allegations are similar to class allegations. Alternatively, these allegations are like a civil complaint brought by the Federal Trade Commission alleging that numerous consumers have been harmed. Plaintiff has plausibly alleged that there are other losers. There is no heightened pleading standard for Loss Recovery Act claims.

### D. Underdog Sports Violates the Unlawful Internet Gaming Enforcement Act.

Underdog Sports claims that it is exempt from liability in this case because it complies with Unlawful Internet Gaming Enforcement Act ("UIGEA"), 31 USCS §§ 5361 et seq. This argument is meritless. The UIGEA is inapplicable because it is a payment-processing law. Moreover, the UIGEA does not displace state gambling law or the Wire Act. Finally, Underdog Sports is not in compliance with the UIGEA, the Wire Act, or current Illinois Internet gambling law.

The UIGEA does not provide a defense to Defendant. The UIGEA does not pre-empt state law. The UIGEA Rule of construction states: "No provision of this subchapter [31 USCS §§ 5361

et seq.] shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." Thus, there is no state law pre-emption. The UIGEA does not displace Illinois gambling law that limits games and wagers for money by means of the Internet to lotteries, raffles, and sports wagering. The UIGEA does not alter the Wire Act.

The Wire Act, 18 U.S.C.S. 1084(a), applies to wagers on any sporting event or contest, that is, sports betting. Over-under proposition bet parlay wagers are sports betting and therefore the Wire Act prohibits interstate transmission if information to facilitate this activity. Parlay sports wagers are illegal sports wagering and have been prosecuted in this District. See e.g. *United States v. Sarno*, 1993 U.S. Dist. LEXIS 9870, at *7 (N.D. Ill. July 16, 1993). The *Sarno* case details how The Outfit has been profiting from parlay sports wagering for many years in Chicago – long before DFS contests emerged from Fanduel in 2010. The Wire Act applies to Internet sports gambling. *United States v. Lyons*, 740 F.3d 702, 716 (1st Cir. 2014).

The UIGEA interpretation offered by Underdog Sports is frivolous. As Marc Zwillinger, a gambling expert, and former Assistant U.S. Attorney who prosecuted gambling crimes, stated:

> I have been advising fantasy companies since 2000, after I left the DOJ where I worked on Internet gambling enforcement and I'm a former Board Member of the FSTA/FSGA. Unfortunately, [Underdog Sports is] the one pushing a slanted self-serving narrative of UIGEA and not the one the legal experts would agree with. The difference between DFS and season-long and your prop-style betting versus fantasy sports is night and day…. [A] bet between a single user and the house is not a "contest", it's a bet… Offering this style of betting isn't innovative, it's old school, and it's not what UIGEA allows. It's one thing to argue that you have a legal game of skill in states that allow skill games, but quite another to claim that this type of contest is a fantasy game. That's really the fantasy here.[5]

---

[5] https://www.linkedin.com/feed/update/urn:li:activity:7107402078896930816?commentUrn=urn %3Ali%3Acomment%3A%28activity%3A7107402078896930816%2C7108216953160298496 %29&dashCommentUrn=urn%3Ali%3Afsd_comment%3A%287108216953160298496%2Curn %3Ali%3Aactivity%3A7107402078896930816%29.

This is indeed "old-school" bookmaking. If the Court rules in favor of Underdog Sports on this motion it would give license for The Outfit to return to offering gambling in Illinois. The ISWA was passed to eliminate the influence of The Outfit in gambling and only permit regulated and licensed companies to offer gambling that is taxed. 720 ILCS 5/28-1.1(a) ("*Declaration of Purpose*. Recognizing the close relationship between professional gambling and other organized crime, it is declared to be the policy of the legislature to restrain persons from engaging in the business of gambling for profit in this State.")

Marc Zwillinger is not the only expert that has opined that Defendant's interpretation of the UIGEA is wrong. Professor Marc Edleman, who is cited in the *Dew-Becker v. Wu* case, wrote:

> Even as the colloquial definition of fantasy sports has been expanded to include a wide range of daily fantasy sports companies such as FanDuel, DraftKings and Yahoo, the legal definition in most state statutes has remained unchanged. And statutes including the Unlawful Internet Gambling Act define "fantasy sports" as requiring "winning outcomes [that] reflect the relative knowledge and skill of the participants." The term "relative" means comparative to one another. But against-the-house contests do not have participants competing against other participants. Instead, they compete against the host site.[6]

Player prop parlays are not within the UIGEA exemption for fantasy sports. The "player prop parlay" wager placed by Beimfohr did not constitute, "participation in any fantasy or simulation sports game or educational game or contest." There was no simulated game. Beimfohr did not create a roster of players to compete against another roster of players like in *Dew-Becker v. Wu*. In one bet, Beimfohr made over-under proposition bets on Basketball players, Baseball players and a hot-dog eating contest. What simulated sports game would include a hot-dog eater? This argument is a laughable attempt to conceal Defendant's violation of Illinois gambling law and the Wire Act. Beimfohr did not create any "teams;" he made "player prop parlay" wagers.

---

[6]     See https://www.forbes.com/sites/marcedelman/2022/12/05/more-unlicensed-domestic-sports-betting-sites-are-operating-under-the-guise-of-fantasy-sports/?sh=39e19e4851d6.

Next, the UIGEA exemption prohibits the value of payouts being "determined by... the amount of any fees paid..." 31 U.S.C.S. § 5362. The payout on the Underdog Sports under-over parlay was determined by the amount paid by Beimfohr for the wager. The $500 wagers paid 3x for a total of $1500. But if he would have paid $100 then he would have won 3x for $300. The payout depended on the amount Beimfohr paid for the bet and therefore this player prop parlay does not fit the within the UIGEA exemption.

The UIGEA exemption also requires, "[a]ll winning outcomes reflect the relative knowledge and skill of the participants" See Section 1(E)(ix)(II). The term "participants" is plural. But Beimfohr was the only participant in this parlay wager. There was no other participant. It was an "against the house" wager, which did not involve the relative knowledge or skill of any other people. Beimfohr was not engaged in a head-to-head or peer-to-peer game or contest. Rather he bet and risked money and made guesses on propositions set by the "house." The opinions of Marc Zwillinger and Marc Edleman are persuasive authority that should not be ignored by this Court.

### E. Beimfohr's Status as a "Professional Gambler" Does Not Bar the Claim.

Defendant argues because Underdog runs an illegal gambling operation and Beimfohr is a professional illegal gambler, Beimfohr would not be able to sue Underdog. Defendant's argument goes against the holding in *Auxer v. Llewellyn*, 142 Ill. App. 265 (Ill. App. 2nd Dist. 1908). In that case defendant argued that plaintiff should not be able to recover his gambling loss. The defendant in *Auxer* argued that since the parties were *in peri delicto* and *Auxer* was part of a gambling scheme to fix a boxing match that he could not recover. The court rejected this argument and held that any loser, even a loser *in peri delicto*, could recover under the Loss Recovery Act stating, "We are of the opinion that while the appellant was willing to be a confidence shark, still the statute of this state, in the interest of public policy," permits those *in peri delicto* to recover. *Id*. at 271-272.

*Watts v. Malatesta*, 262 N.Y. 80 (Ct. App. N.Y. 1933), a case from New York, is inapplicable. New York – unlike Illinois – has an exemption for casual gamblers. Penal Law § 225.00 (9); *Watts*, 262 N.Y. at 82. Because casual gamblers may gamble in New York and professional gamblers are criminals, the Court in *Malatesta* prohibited professional gamblers from recovering losses. This is simply not the law in Illinois. All gamblers may use the loss recovery act to recover losses to deter gambling in Illinois. *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 18 (2020) ("section 28-8(a) is meant to encourage the filing of lawsuits as a means of deterring illegal gambling. Any increase in litigation is … the explicit purpose of the statute.")

The Illinois cases cited also do not support Defendant's argument. *Shaffner v. Pinchback*, 133 Ill. 410 (1890), unlike *Auxer*, is not a loss recovery act claim. *Shaffner* sought to collect a loan. The loan was for the purpose of gambling. The Defendant in that case was not the winner of a wager but a borrower. Defendant misrepresents the holding of *Kearney v. Webb*, 278 Ill. 17 (1917). That case involved an employer trying to recover money used by an employee for illegal gambling. The Court held the company had a right to repudiate an illegal contract. The case supports Plaintiff and holds a gambling winner may not keep such money in Illinois. *Id*. at 22.

Finally, the right vested in Lavery to sue is independent, not derivative, of Beimfohr's. 720 ILCS 5/28-8(a) provides that the loser can sue within six months, and if he does not, then 720 ILCS 5/28-8(b) provides "any person" can sue for three times the amount. Subsection 28-8(a) has been interpreted as imposing a 6-month statute of limitations on the "loser's" right to recover monies paid under 5/28-8(a). *Kizer v. Walden*, 198 Ill. 274 (Ill. 1902). If the loser does not sue withing six months of payment of any part of the loss, then their claim is extinguished, as barred by the statute of limitations. At this time, a right to sue then accrues in any other person. As explained in *Moench v. Graff*: "in case the party who shall lose shall not within six months sue for

and recover such money or other thing lost, then it shall be lawful for any other person to sue for and recover from the winner treble the value of the money or other valuable thing lost or delivered." 212 Ill. App. 42 (Ill. App. 3 Dist. 1918). There is nothing derivative about it. There is no "shoe standing" – it is an independent *qui tam* remedy, conferred on a common relator, to promote the public good and deter and prevent illegal gambling.

**F.    Whether the gambling is a "game of skill" is an affirmative defense.**

735 ILCS 5/28-1(a)(2) provides, "[a] person commits gambling when he or she… (2) knowingly makes a wager upon the result of any game, contest, or any political nomination, appointment or election." Unlike Subsection (a)(1),[7] subsection (a)(2) does not provide – within the statutory language itself – an exemption for "bona fide contests for the determination of skill, speed or endurance." To the extent Defendant wants to rely on subsection (b)(2), which "withdraws certain acts or certain persons from the operation of the statute," *People v. McPeak*, 2012 IL App (2d) 110557 at ¶ 6, "the exception is a matter of defense." *Id.* Thus, the burden is on the Defendant to prove the defense that the gambling at issue is a "game of skill." See *N.L.R.B. v. Ky. River Cmty. Care, Inc*., 532 U.S. 706, 711 (2001); *Shaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (burden of proof shifts to defendant when element can be fairly characterized as an affirmative defense or exemption); *Be-Mac Transport Co. v. Grabiec*, 20 Ill. App. 3d 345, 354, (1st Dist. 1974). Moreover, as argued above, this exception does not even apply to Internet gambling.

---

[7]    Subsection (a)(1), states: "knowingly plays a game of chance or skill for money or other thing of value, <u>unless excepted</u> in subsection (b)." In a claim brought under subsection (a)(1), Plaintiff would have to plead around the exception because it "appears as part of the body of a substantive offense" *People v. McPeak* , 2012 IL App (2d) 110557 at ¶ 6 ("[a]lthough an exception may appear within the statutory definition of an offense, it is 'part of the body' of the offense only if it 'is so incorporated with the language of the definition that the elements of the offense cannot be accurately described without reference to the exception.'")

WHEREFORE, Plaintiff respectfully requests Defendant's Motion to Dismiss be denied.

Respectfully Submitted,

MARK LAVERY,

/s/ Christopher V. Langone
By One of His Attorneys

Christopher V. Langone
205 N. Michigan Ave., Suite 810
Chicago, IL 60601
312-720-9191
chris@langonelaw.com

# EXHIBIT 1

Forthcoming 57 American Business Law Journal ___ (2020).

**Regulatory Categorization and Arbitrage: How Daily Fantasy Sports Companies Navigated Regulatory Categories Before and After Legalized Gambling**

**John T. Holden[†], Christopher M. McLeod[††], & Marc Edelman[†††]**

**Table of Contents**

Abstract .................................................................................................................2

**Introduction** ......................................................................................................2

**I: Regulatory Arbitrage** ...............................................................................4

   **A.**   **Historical and Current Conditions of Arbitrage** ...................................5

   **B.**   **A Three-Party Transaction**.................................................................7

   **C.**   **Recognizing Opportunities for Arbitrage** ...........................................8

   **D.**   **Strategic Regulatory Categorization** ..................................................9

**II. The Daily Fantasy Sports Industry** ....................................................10

   **A.**   **Sports Gaming, Fantasy Sports, and the Era Before Commercialized DFS**...........11

   **B.**   **Emergence of UIGEA** ......................................................................12

   **C.**   **Gambling under State Law**...............................................................14

   **D.**   **Legal Troubles?**...............................................................................16

**III. DraftKings and FanDuel's Messaging** ..............................................18

   **A.**   **The Sources** ......................................................................................18

   **B.**   **Before the New York Lawsuit: 2009 to October 2015**........................21

   **C.**   **During the New York Lawsuit: October 2015 to October 2016**.................23

   **D.**   **Immediate Aftermath of the New York Lawsuit: October 2016 to July 2017**.........28

   **E.**   **Prior to Supreme Court decision on PASPA: August 2017 to May 2018**.................29

   **F.**   **After *Murphy*: May 2018 to 2019** .................................................30

**IV. Implications**.............................................................................................32

   **A.**   **Direct Implications** .........................................................................32

   **B.**   **Business Implications**......................................................................35

   **C.**   **Legal Implications** ..........................................................................37

**Conclusion**.....................................................................................................40

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

## Abstract

This article uses the context of daily fantasy sports (DFS) to analyze how companies use strategic categorization in regulatory arbitrage. DFS is an ideal context to study this issue for three reasons. First, DraftKings and FanDuel were able to categorize themselves differently to different audiences at different times in a manner that evaded categorization as an illegal gambling activity, only to then dominate the sports betting market after the Supreme Court's decision in *Murphy v. National Collegiate Athletic Association*. This type of strategic categorization, which we call "fluid categorization," raises important questions for regulators and others concerned with regulatory arbitrage. It also provides lessons for other businesses. Second, DraftKings and FanDuel were engaged in a lawsuit with the New York Attorney General's (NYAG) office beginning in October 2015, during which time the two companies engaged in intense lobbying efforts to change the prevailing view of their services under the law – a concerted process that provides substantial evidence of how companies avoid unfavorable regulatory categorization. Third, DraftKings and FanDuel were prominent advertisers peaking at over 10,000 advertisements a month in the lead up to the 2015 National Football League (NFL) season. By analyzing the advertisements and documents from the NYAG's case, we examine how DraftKings and FanDuel were able to strategically categorize themselves, with different audiences. While this article has broad implications for the sports gambling marketplace, it also contributes to meaningful discourse for the broader business community, as its findings are relevant to industries, beyond DFS, that offer gray market products and seek to fight categorical labels until there is a reclassification-event.

## Introduction

Regulatory arbitrage takes advantage of generally applicable laws that imperfectly cover all transaction types.[1] On May 14, 2018, the U.S. Supreme Court declared the Professional and Amateur Sports Protection Act (PASPA) unconstitutional, opening the doors for states to legalize sports wagering across the country.[2] FanDuel and DraftKings, two companies that established the quasi-gambling Daily Fantasy Sports (DFS) industry, quickly emerged as industry leaders in the

---

[†] John T. Holden is an Assistant Professor in the Department of Management at the Spears School of Business at Oklahoma State University.

[††] Christopher M. McLeod is an Assistant Professor of Sport Management at Texas Tech University.

[†††] Marc Edelman is a tenured Professor of Law at the Zicklin School of Business, Baruch College, City University of New York. He is also an adjunct professor at Fordham University School of Law.

[1] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 229 (2010).

[2] Murphy v. Nat'l Coll. Athletic Ass'n, 584 U.S. ___ , 138 S. Ct. 1461 (2018) (holding: "it is clear that the PASPA provision prohibiting state authorization of sports gambling is not a preemption provision because there is no way in which this provision can be understood as a regulation of private actors. It certainly does not confer any federal rights on private actors interested in conducting sports gambling operations. (It does not give them a federal right to engage in sports gambling.) Nor does it impose any federal restrictions on private actors. If a private citizen or company started a sports gambling operation, either with or without state authorization, §3702(1) would not be violated and would not provide any ground for a civil action by the Attorney General or any other party. Thus, there is simply no way to understand the provision prohibiting state authorization as anything other than a direct command to the States. And that is exactly what the anticommandeering rule does not allow."). *Id* at 24.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

newly legal sports betting markets.[3] The transition for FanDuel and DraftKings from quasi-gambling companies to full-fledged gambling companies was nearly seamless, despite the companies having spent the better part of the previous five years arguing that DFS was not gambling (although sharing nearly all of the legal characteristics of gambling).[4] These two companies, which dominated the daily fantasy market before the end of PASPA, managed to effectively flip a switch and turn on their sports betting apparatus within weeks of the Supreme Court's decision, taking their electronic customer lists with them.[5] In all likelihood, they were preparing for this outcome for a very long time – even prior to the Supreme Court's May 14, 2018 ruling.[6]

In transitioning seamlessly into full-blown sports gambling companies, it seems FanDuel and DraftKings were able to align themselves in different regulatory categories without fundamentally changing their underlying service – something that FanDuel and DraftKings have done several times over the course of their short lifespans.[7] This categorization strategy has enabled these companies to avoid regulation, and to become two of the most recognized brands in U.S. legal sports betting.[8]

Regulatory arbitrage can be thought of as manipulating the structure of a deal to exploit "the gap between the economic substance of a transaction and its legal regulatory treatment, taking advantage of the legal system's intrinsically limited ability to attach formal labels that track the economics of transactions with sufficient precision."[9] This behavior is common in finance and tax law.[10] Examples of regulatory arbitrage include the offering of zero coupon bonds in the 1980s,[11] Bill Veeck's depreciation of baseball players,[12] and service innovations such as Uber and Lyft,

---

[3] DraftKings was the first company to launch mobile sports betting after the Supreme Court struck down PASPA. *See* Dustin Gouker, *DraftKings' First Land-Based Sportsbook Is Coming This Week To Mississippi*, LEGAL SPORTS REP. (Nov. 12, 2018), https://www.legalsportsreport.com/25836/draftkings-sportsbook-coming-mississippi/. FanDuel, which was purchased by European bookmaker Paddy Power Betfair, and DraftKings are the top two companies in the new legal market outside of Nevada with regards to revenue. *See* Jacob Feldman, *FanDuel, DraftKings Set to Compete for the American Sports Gambling in 2019*, SPORTS ILLUSTRATED (Dec. 20, 2018), https://www.si.com/tech-media/2018/12/20/future-sports-gambling-technology-apps-fanduel-draftkings.

[4] *See* Kurt Wagner, *DraftKings, which has long argued its business isn't gambling, wants to build a sports gambling business,* RECODE (Feb. 2, 2018), https://www.recode.net/2018/2/2/16964742/draftkings-sports-gambling-product-jason-robins. Gambling games contain three essential elements: a prize, some degree of chance, and consideration. John T. Holden, *Trifling and Gambling with Virtual Money*, 25 UCLA ENT. L. REV. 41, 91-92 (2018).

[5]5 While not yet sharing a same virtual wallet between sports betting and DFS players, the interface used by DraftKings and FanDuel for DFS and sports betting would have been familiar to consumers who already used the product. Bill King, *DraftKings, FanDuel taking the lead in states' new sports gambling*, BIZ J. (Nov. 7, 2018), https://www.bizjournals.com/newyork/news/2018/11/07/draftkings-fanduel-taking-the-lead-in-gambling.html.

[6] Polina Marinova, *DraftKings Is Getting Into Real Sports Betting*, FORTUNE (Aug. 1, 2018), http://fortune.com/2018/08/01/draftkings-sportsbook-betting/.

[7] *See infra* Section IV.

[8] Rey Mashayekhi, *Inside the Battle for the Future of Sports Betting*, FORTUNE (Apr. 10, 2019), http://fortune.com/longform/sports-betting-battle/.

[9] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 229 (2010).

[10] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 229 (2010).

[11] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 251 (2010).

[12] Bill Veeck was a baseball executive who managed to convince the Internal Revenue Service (IRS) that a baseball team roster was a depreciable asset. The IRS thus allowed Veeck to use a Roster Depreciation Allowance (RDA). The

3

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

which have attempted to avoid taxi company regulations.[13] While regulatory arbitrage may help innovation and produce more efficient transactions, the practice undermines the spirit of the law and can lead to well-resourced entities being able to exploit so-called legal loopholes. Indeed, many would argue exploiting loopholes is exactly what DraftKings and FanDuel did in the quasi-gambling and actual gambling marketplaces.[14]

This article uses the context of daily fantasy sports to analyze how two major companies used strategic categorization in regulatory arbitrage.[15] Part I of this article examines regulatory arbitrage—the primary strategy used by DraftKings and FanDuel to survive as gray-market products during a period of uncertain legal times. Part II explores how the DFS industry emerged and matured into the blossoming sports gambling industry and thus eroded the gray-market label of certain companies' activities. Part III examines how DraftKings and FanDuel positioned and differentiated themselves from gambling in their political and legal messaging, and how DraftKings and FanDuel used their marketing messaging strategically, at different times, to convey various themes regarding the association with gambling. Finally, in Part IV, we provide an overview of how DraftKings and FanDuel provide lessons for other businesses, and lessons for regulators who seek to have the spirit of laws enforced.

## I: Regulatory Arbitrage

The Oxford Dictionary of Finance and Banking defines regulatory arbitrage as: "The setting up of organizations and transactions to avoid the impacts of regulation."[16] Regulatory arbitrage has been a domain of the powerful for centuries, with U.S. examples dating back to the Civil War-era, "when the 1863 National Banking Act imposed a 10 percent tax on banking notes issued by state banks [and] U.S. banks shifted from state to federal charters to avoid the tax."[17] Despite the long history of corporations assailing themselves of the virtues of regulatory systems to avoid taxation or obtain other material benefits, the legal literature on the subject is sparse.[18] Regulatory arbitrage has been framed by some as a game of cat and mouse between firms and

---

RDA enabled teams to deduct a player's contract as a depreciating asset and as a business expense. Martin J. Greenberg, *Roster Depreciation Allowance*, LAW OFFICE OF MARTIN J. GREENBERG (Feb. 14, 2015), https://www.greenberglawoffice.com/roster-depreciation-allowance/.

[13] Brian X. Chen, *A feisty startup is met with regulatory snarl*, N.Y. TIMES (Dec. 3, 2012), https://www.nytimes.com/2012/12/03/technology/app-maker-uber-hits-regulatory-snarl.html.

[14] *See* Brent Schrotenboer, *Fantasy Sports Debate: Gambling or not Gambling?*, USA TODAY (Jan. 11, 2015), https://www.usatoday.com/story/sports/fantasy/2015/01/11/fantasy-sports-gambling-debate-fan-duel/21612771/.

[15] The marijuana industry is one potential industry that may be informed by this article, in part because states and the federal government remain at odds over the sale of both medical and recreational marijuana. There are some parallels that have previously been examined between marijuana and sports gambling regulation. *See* John T. Holden, *Prohibitive Failure: The Demise of the Ban on Sports Betting*, 35 GA. ST. U. L. REV. 329 (2019).

[16] JONATHAN LAW, A DICTIONARY OF FINANCE & BANKING (6th ed. 2018).

[17] Hayagreeva Rao et al., *Laws of Attraction: Regulatory Arbitrage in the Face of Activism in Right-to-Work States*, 76 AM. SOC. REV. 365, 367 (2011).

[18] Annelise Riles, *Managing Regulatory Arbitrage: A Conflict of Laws Approach*, 47 CORNELL INT'L L.J. 63, 68 (2014).

4

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

government regulators, or as good guys—the government regulators—versus bad guys—firms seeking to avoid paying their fair share of taxes or complying with regulations.[19]

More specifically, arbitrage is a strategy of taking two similar options and advancing one, which is mispriced, allowing for an advantage over the equivalent.[20] The value of arbitrage in a financial situation is "traders seek out hidden functional similarities across what look on the surface like differences: a basket of stocks and an index, or the rules of one legal system and those of another."[21] However, this strategy can be more broadly applicable than in the trading of like securities. In fact, similarities between gambling and DFS created opportunities for DraftKings and FanDuel to operate as arbitrageurs.[22] FanDuel and DraftKings carefully positioned their products as distinct from more traditional forms of sports betting, which is a strategy similarly employed by many firms.[23] Even the advent of the term "daily fantasy sports" seems to arise from a careful effort to liken the company's products to something more akin to traditional fantasy sports and different from sports gambling during a time in which online sports gambling was nearly universally illegal in the U.S.[24]

This Section explores the business practice of regulatory arbitrage. Part A discusses the historical and current conditions of arbitrage. Part B sets forth the notion that every business transaction is truly a three-party transaction, which at least indirectly, involves the government – thus setting the stage for arbitrage opportunities. Part C explores several opportunities that exist for arbitrage within modern business. Finally, Part D introduces the business strategy of strategic regulatory categorization.

## A.    Historical and Current Conditions of Arbitrage

Since arbitrage is an intrinsic part of any regulatory system, the history of arbitrage dates back many centuries.[25] One of the earliest noted examples of arbitrage may be traced to the fourth century A.D. when wealthy Romans used legal exceptions to avoid their tax burdens.[26] Similarly,

---

[19] Annelise Riles, *Managing Regulatory Arbitrage: A Conflict of Laws Approach*, 47 CORNELL INT'L L.J. 63, 70 (2014).

[20] Annelise Riles, *Managing Regulatory Arbitrage: A Conflict of Laws Approach*, 47 CORNELL INT'L L.J. 63, 70 (2014).

[21] Annelise Riles, *Managing Regulatory Arbitrage: A Conflict of Laws Approach*, 47 CORNELL INT'L L.J. 63, 70 (2014).

[22] Annelise Riles, *Managing Regulatory Arbitrage: A Conflict of Laws Approach*, 47 CORNELL INT'L L.J. 63, 70 (2014). "An arbitrageur is a type of investor who attempts to profit from price inefficiencies in the market by making simultaneous trades that offset each other to capture risk-free profits. An arbitrageur would, for example, seek out price discrepancies between stocks listed on more than one exchange by buying the undervalued shares on one exchange while short selling the same number of overvalued shares on another exchange, thus capturing risk-free profits as the prices on the two exchanges converge." James Chen, *Arbitrageur,* Investopedia (Last updated Jan. 17, 2018), https://www.investopedia.com/terms/a/arbitrageur.asp.

[23] *See* Pinar Ozcan & Kerem Gurses, *Playing Cat and Mouse: Contests over Regulatory Categorization of Dietary Supplements in the United States*, 61 ACAD. MGMT. 1789, 1796 (2018).

[24] *See* Marc Edelman, *Navigating the Legal Risks of Daily Fantasy Sports: A Detailed Primer in Federal and State Gambling Law*, 2016 U, ILL. L. REV. 117 (2016).

[25] Bruce Bartlett, *How Excessive Government Killed Ancient Rome,* 14 CATO J. 287, 300-01 (1994).

[26] Michael S. Knoll, *The Ancient Roots of Modern Financial Innovation: The Early History of Regulatory Arbitrage*, 78 OR. L. REV. 93 (2008).

5

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

during the era in which religious foundations served as the main regulatory bodies, commercial lenders regularly used arbitrage to seek innovative ways to avoid restrictions on usury.[27]

The use of arbitrage practices, however, increased over the past century based on various structural factors related to the modern economy and its governance systems. First, globalization has multiplied opportunities for all types of regulatory arbitrage.[28] The increasing connections between nation-states provides more opportunities for people to exploit differences in how legal systems treat the same transactions.[29] In addition, the Internet has served as a catalyst for regulatory arbitrage because users can "evade disliked domestic regulations by communicating/transacting under regulatory regimes with different rules."[30] The increase in the administrative state has increased opportunities and rewards for successful arbitrage.[31] Meanwhile, changes to the legal profession have created a class of professionals who specialize in making value by reducing regulatory costs.[32] Global trade has also highlighted inconsistencies in governance.[33] There is evidence that banks transfer funds to markets with fewer regulations.[34] One implication is a regulatory "race to the bottom," where nations and states compete with each other for investment by deregulating financial industries.[35]

In modern times, regulatory arbitrage is often discussed in the context of finance and tax law because these transactions are comprised of fungible assets that can be easily rearranged to take advantage of regulatory gaps and inconsistencies.[36] For example, banks created "zero coupon bonds" in 1981 after discovering a tax loophole that allowed corporations to issue bonds sold below face value that paid no interest and gained substantial tax benefits.[37] In this case, it was relatively easy to make zero coupon bonds out of the same underlying assets, while also taking advantage of their tax benefits.[38] However, while arbitrage is easier and likely more prevalent in industries with fungible assets, regulatory arbitrage is also seen in other industries where

---

[27] Michael S. Knoll, *The Ancient Roots of Modern Financial Innovation: The Early History of Regulatory Arbitrage*, 78 OR. L. REV. 93 (2008).

[28] Hossein Nabilou, *Regulatory Arbitrage and Hedge Fund Regulation: The Need for a Transnational Response*, 22 FORDHAM J. CORP. & FIN. L. 557, 561 (2017).

[29] Hossein Nabilou, *Regulatory Arbitrage and Hedge Fund Regulation: The Need for a Transnational Response*, 22 FORDHAM J. CORP. & FIN. L. 557, 561 (2017).

[30] A. MICHAEL FROOMKIN, THE INTERNET AS A SOURCE OF REGULATORY ARBITRAGE 10 (1996).

[31] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227 (2010).

[32] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227 (2010).

[33] Joel F. Houston, Chen Lin, & Yue Ma, *Regulatory Arbitrage and International Bank Flows*, 67 J. FINANCE 1845 (2012).

[34] Joel F. Houston, Chen Lin, & Yue Ma, *Regulatory Arbitrage and International Bank Flows*, 67 J. FINANCE 1845 (2012).

[35] Joel F. Houston, Chen Lin, & Yue Ma, *Regulatory Arbitrage and International Bank Flows*, 67 J. FINANCE 1845 (2012); *See also* Philipp Genschel & Thomas Plumper, *Regulatory Competition and International Co-operation*, 4 J. EUROPEAN PUB. POL'Y 626, 633 (1997).

[36] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227 (2010).

[37] Lawrence Fisher et al., *Tax Incentives and Financial Innovation: The Case of Zero-Coupon and Other Deep-Discount Corporate Bonds*, 18 FIN. REV. 292 (1983).

[38] Lawrence Fisher et al., *Tax Incentives and Financial Innovation: The Case of Zero-Coupon and Other Deep-Discount Corporate Bonds*, 18 FIN. REV. 292 (1983).

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ____ (2020).

innovators create new goods or services while challenging regulatory categorization.[39] Uber, for example, has sought to be regulated as a technology company rather than as a taxi company to avoid regulations.[40]

Thus, while regulatory arbitrage is most likely to occur in situations where assets and transactions can be modified easily, it is also possible for arbitrage to occur in situations where businesses challenge regulatory categorization without changing the underlying asset or transaction, like DFS. This second means of arbitrage—through regulatory re-categorization—raises questions of social constructivism in regulation, prompting an inquiry in to how firms use categorization strategies to avoid regulatory costs.[41]

## B.    A Three-Party Transaction

Contrary to how most contracts classes teach the basics of a contractual relationship, a typical business relationship actually has at least three parties: a buyer, a seller, and the government.[42] The government is the first party to the deal, as it is the government who sets the rules of the transaction through laws and other regulations, which determine the conditions over the scope of the transaction.[43] While the government sets the conditions of the transaction, the government is, in fact, an absentee negotiator, not present for the actual negotiations, allowing the two parties to attempt to minimize the government's role or stake in the transaction.[44] Although the government sets the rules for transactions under most circumstances, the government cannot retroactively change the conditions to stop the other two parties from negotiating their way out of the applicable regulations.[45] Therefore, parties may pursue regulatory arbitrage to lessen the costs of the absent government regulator.

The challenge for regulators is to develop conditions that address immediate concerns, while are sufficiently tactile to address future innovations.[46] While this obstacle of drafting regulations forward-looking enough to anticipate innovation is difficult, firms have historically been able to capitalize on this failure of regulators to precisely target all future conduct.[47] For instance, the convertible bond market in the late 1980s in the United Kingdom (UK) was exploited by firms, because regulations required financial statements to provide a "true and fair view of the

---

[39] Lawrence Fisher et al., *Tax Incentives and Financial Innovation: The Case of Zero-Coupon and Other Deep-Discount Corporate Bonds*, 18 FIN. REV. 292 (1983).

[40] Brian X. Chen, *A feisty startup is met with regulatory snarl*, N.Y. TIMES (Dec. 3, 2012), https://www.nytimes.com/2012/12/03/technology/app-maker-uber-hits-regulatory-snarl.html.

[41] Jeffrey T. Macher et al., *The Influence of Firms on Government*, 11 B.E. J. ECON. ANALYSIS & POL'Y 1 (2011).

[42] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 238 (2010).

[43] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 238 (2010).

[44] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 238 (2010).

[45] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 238 (2010).

[46] *See* Atul K. Shah, *Regulatory Arbitrage Through Financial Innovation*, 10 ACCOUNTING, AUDITING & ACCOUNTABILITY J. 85 (1997).

[47] Atul K. Shah, *Regulatory Arbitrage Through Financial Innovation*, 10 ACCOUNTING, AUDITING & ACCOUNTABILITY J. 85, 99 (1997).

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

state of affairs of the company."[48] This language provided sufficient confusion as to what was acceptable behavior that even though convertible bonds enabled companies to present a more favorable financial outlook than, perhaps reality would dictate, there was insufficient strength to use the law as a basis for bring the practice to a halt.[49]

## C.  Recognizing Opportunities for Arbitrage

Regulatory arbitrage opportunities are a natural outcome of ill-fitting regulatory systems, where legislators do their best to enact laws, but are unable to provide an all-encompassing bill that interprets all potential avoidance strategies.[50] Three types of inconsistencies create arbitrage opportunities: regulatory regime inconsistencies, economic inconsistencies, and time inconsistencies.[51]

Regulatory regime inconsistency allows a firm to create value because of differences in how a single transaction is treated under two different types of regulation.[52] In the case of DFS, the product offered by DraftKings and FanDuel appears to resemble gambling more closely than it does traditional, full-season fantasy sports; but the two markets are treated vastly differently. Fantasy sports have historically been viewed as a healthy means of engaging with sports and friends.[53] Some groups, such as the National Football League (NFL), even market versions of fantasy football to schools as a means of teaching students educational skills.[54] By contrast, governments have traditionally viewed sports gambling as a pariah, costing society millions of dollars in social and productivity costs.[55] DFS companies emerged somewhere in between the two extremes, advocating that they were akin to traditional fantasy sports, while at the same time building websites that more closely resembled gambling sportsbooks.[56] DraftKings and FanDuel thus have primarily exploited the uncertainty of proper labels to apply to the fantasy sports

---

[48] Atul K. Shah, *Regulatory Arbitrage Through Financial Innovation*, 10 ACCOUNTING, AUDITING & ACCOUNTABILITY J. 85, 99 (1997).

[49] Atul K. Shah, *Regulatory Arbitrage Through Financial Innovation*, 10 ACCOUNTING, AUDITING & ACCOUNTABILITY J. 85, 99-100 (1997).

[50] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 243 (2010).

[51] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 244 (2010).

[52] Victor Fleischer, *Regulatory Arbitrage*, 89 TEX. L. REV. 227, 244 (2010).

[53] *See* Erica R. Halverson & Richard Halverson, *Fantasy Baseball: The Case for Competitive Fandom*, 3 GAMES & CULTURE 286 (2008).

[54] Dustin Gouker, *Groups Call Out NFL For Pushing Fantasy Sports With Prizes To Kids*, LEGAL SPORTS REP. (Feb. 24, 2016), https://www.legalsportsreport.com/8484/nfl-fantasy-sports-and-kids/. While the NFL maintains that this is an effort to engage students with educational skills through football, others have criticized it as a means of introducing gambling to children and indoctrinating children to NFL football. *See also* Patrick Hruby, *How the NFL Brands Itself in American Classrooms*, VICE SPORTS (Feb. 17, 2015), https://sports.vice.com/en_us/article/8qpjep/how-the-nfl-brands-itself-in-american-classrooms.

[55] David Purdum, *Are we doing enough to help problem gamblers?* ABC NEWS (Sept. 19, 2018), https://abcnews.go.com/Sports/problem-gamblers/story?id=57937887.

[56] *See* National Council on Problem Gambling, *Daily Fantasy Sports* (last visited Dec. 16, 2018), https://www.ncpgambling.org/programs-resources/responsible-gaming/dfs/. ("[National Council on Problem Gambling] NCPG has been working on Daily Fantasy Sports (DFS) issues since 2013. While we believe the vast majority of DFS players are at little or no risk for addiction, we have serious concerns about addiction among others.").

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

borderlands between the presumably benign fantasy sports industry and the stigmatized, but rarely sanctioned, sports betting universe.[57]

## D.    Strategic Regulatory Categorization

It is also possible for businesses to create arbitrage opportunities by using corporate political strategies.[58] Corporate political strategies, such as lobbying, refer to firms' ability to affect governmental policies,[59] which allows firms to shape their regulatory environment.[60] One type of political strategy is strategic categorization, or firms' use of framing, messaging, and coalition building to align themselves in certain product or industry categories rather than others.[61] Product categories exist because consumers, regulators, and retailers depend on these frameworks to make economic decisions.[62] For instance, a study of publicly-traded firms from 1985-94 showed that firms not covered by securities analysts received a discounted stock price because audiences were confused about the firms' identities and confusion decreased demand.[63] In other words, belonging to, and conforming to a category, even if the category is a largely meaningless label, influences firm performance.[64] These cognitive connections create the opportunity for organizations to engage in strategic categorization by manipulating how they and their competitors are classified.[65] Firms can also signal membership to legitimate categories,[66] associate with rivals,[67] or create new categories.[68]

Firms have been seen to use a variety of different strategies when there is regulatory uncertainty.[69] The strategies employed include: avoidance, reduction, adaptation, and disregard to

---

[57] *See* Harold Stark, *What Is Daily Fantasy Sports and Why Is Everyone So Obsessed With It?*, FORBES (Dec. 9, 2017), https://www.forbes.com/sites/haroldstark/2017/12/09/what-is-daily-fantasy-sports-and-why-is-everyone-so-obsessed-with-it/#47ba5daf1be3.

[58] Jeffrey T. Macher et al., *The Influence of Firms on Government*, 11 B.E. J. ECON. ANALYSIS & POL'Y 1 (2011).

[59] *See* Jeffrey T. Macher et al., *The Influence of Firms on Government*, 11 B.E. J. ECON. ANALYSIS & POL'Y 1 (2011).

[60] Guy L.F. Holburn, & Richard G. Vanden Bergh, *Making Friends in Hostile Environments*: *Political Strategy in Regulated Industries*, 33 ACAD. MGMT. REV. 521 (2008).

[61] Guy L.F. Holburn, & Richard G. Vanden Bergh, *Making Friends in Hostile Environments*: *Political Strategy in Regulated Industries*, 33 ACAD. MGMT. REV. 521 (2008).

[62] Joseph F. Porac et al., *Competitive Groups as Cognitive Communities: The Case of Scottish Knitwear Manufacturers,* 26 J. MGMT. STUD. 397 (1989).

[63] Ezra W. Zuckerman, *The Categorical Imperative: Securities Analysts and the Illegitimacy Discount*, 104 AM. J. SOC. 1398 (1999).

[64] J.P. Vergne & Tyler Wry, *Categorizing Categorization Research: Review Integration, and Future Directions*, 51 J. MGMT. STUD. 56 (2014).

[65] Jean-Phillipe Vergne, *Stigmatized Categories and Public Disapproval of Organizations: A Mixed-Methods Study of the Global Arms Industry, 1996-2007*, 55 ACAD. MGMT. J. 1027 (2012).

[66] Eric Yanfei Zhao, Masakazu Ishihara, & Michael Lounsbury, *Overcoming the Illegitimacy Discount: Cultural Entrepreneurship in the US Feature Film Industry*, 34 ORGANIZATION STUDIES 1747 (2013).

[67] Mark Thomas Kennedy, *Getting Counted: Markets, Media, and Reality*, 73 AM. SOCIOLOGICAL REV. 270 (2008).

[68] Chad Navis & Mary Ann Glynn, *How New Market Categories Emerge: Temporal Dynamics of Legitimacy, Identity, and Entrepreneurship in Satellite Radio, 1990–2005*, 55 ADMINISTRATIVE SCIENCE Q. 439 (2010).

[69] Chad Navis & Mary Ann Glynn, *How New Market Categories Emerge: Temporal Dynamics of Legitimacy, Identity, and Entrepreneurship in Satellite Radio, 1990–2005*, 55 ADMINISTRATIVE SCIENCE Q. 439 (2010).

9

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

potential future categorization.[70] While all four strategies are employed by firms, depending on the scope of regulatory uncertainty regarding their categorization, the perception of uncertainty leads firms to engage more in the policy making process in an attempt to influence how their conduct may be labeled.[71] The manipulation of language and contesting the framing of an activity into what the creator desires can enable a public perception that is favorable to the framer's views.[72] This practice of shaping an image of DFS as a skill-based contest, and therefore distinct from gambling was an effort by FanDuel and DraftKings to strategically categorize themselves.

Strategic categorization may be particularly beneficial to firms navigating regulatory categories, as it can minimize regulatory costs.[73] Like consumers, regulators rely on categorical distinctions.[74] Firms can lessen regulatory costs by using corporate political strategy to earn favorable regulatory categorization.[75] For example, dietary supplement makers were able to substantially reduce regulatory costs in 1976 by moving from the drug category to the food category. When the FDA pushed back, dietary supplement makers were able to avoid regulations again in 1994 by creating an entirely new category.[76] Thus, firms can use strategic categorization during regulatory arbitrage to reduce regulatory costs.[77]

## II. The Daily Fantasy Sports Industry

The emergence of daily fantasy sports as a hybrid activity between traditional fantasy sports and sports gambling provides the perfect context in which to analyze an industry that has engaged in regulatory arbitrage.  Section A of this Part provides a brief history of sports gaming and fantasy sports in the pre-DFS era.  Section B explores the introduction of the Unlawful Internet Gambling Enforcement Act (UIGEA) and its narrow fantasy sports carve-out – a new statute that seemed to invite strategic regulatory categorization behavior.  Section C discusses the emergence of the commercialized daily fantasy sports industry.  Finally, Section D discusses the

---

[70] Christian Engau & Volker H. Hoffman, *Corporate Response Strategies to Regulatory Uncertainty: Evidence From Uncertainty About Post-Kyoto Regulation*, 44 POL'Y SCIENCE 53 (2011).

[71] Christian Engau & Volker H. Hoffman, *Corporate Response Strategies to Regulatory Uncertainty: Evidence From Uncertainty About Post-Kyoto Regulation*, 44 POL'Y SCIENCE 53, 72-73 (2011).

[72] *See* Barbara Slavich, et al., *Politics of Meaning in Categorizing Innovation: How Chefs Advanced Molecular Gastronomy By Resisting The Label*, Organization Studies 1-24 (Online first 2019), *available at:* https://journals.sagepub.com/doi/pdf/10.1177/0170840619835268.

[73] FanDuel and DraftKings navigated categories by classifying their games as games of skill. *See* Ryan Rodenberg, *Daily Fantasy Contests 'Are Not Games of Chance,' Researchers Conclude After Losing Every Contest They Enter*, LEGAL SPORTS REP. (Apr. 30, 2018), https://www.legalsportsreport.com/20030/daily-fantasy-contests-chance-vs-skill/.

[74] Pinar Ozcan & Kerem Gurses, *Playing Cat and Mouse: Contests over Regulatory Categorization of Dietary Supplements in the United States*, 61 ACAD. MGMT. 1789, 1796 (2018).

[75] Pinar Ozcan & Kerem Gurses, *Playing Cat and Mouse: Contests over Regulatory Categorization of Dietary Supplements in the United States*, 61 ACAD. MGMT. 1789, 1796 (2018).

[76] Pinar Ozcan & Kerem Gurses, *Playing Cat and Mouse: Contests over Regulatory Categorization of Dietary Supplements in the United States*, 61 ACAD. MGMT. 1789, 1796 (2018).

[77] Pinar Ozcan & Kerem Gurses, *Playing Cat and Mouse: Contests over Regulatory Categorization of Dietary Supplements in the United States*, 61 ACAD. MGMT. 1789, 1796 (2018).

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ____ (2020).

legal troubles under which daily fantasy sports operators seemed to find themselves, around late 2015.

## A.    Sports Gaming, Fantasy Sports, and the Era Before Commercialized DFS

While the exact origin of fantasy sports is the subject of debate amongst experts, some experts trace fantasy sports and sports-based gaming back to the 1920s and a board game created by the Ethan Allen company named All-Star Baseball.[78] Then, in the early 1960s, a group of gambling-oriented friends formed the Greater Oakland Pigskin Prognosticators League, which is regarded by some as the first fantasy football league.[79] Around this same time, Bill Gamson, a University of Michigan psychology professor who was more attuned to the statistical elements of baseball, began offering a slightly different game that he called "The Baseball Seminar."[80] Entrants into Gamson's "Baseball Seminar" paid a ten-dollar entry fee to select players who would be evaluated based on their performance over an actual Major League Baseball season.[81] One of those who heard about Gamson's seminar was a University of Michigan student, turned journalist, named Daniel Okrent, who would be widely cited as the inventor of fantasy baseball.[82]

Okrent's status as inventor of fantasy baseball is contingent on how others view the role of games like Strat-O-Matic and Gamson's seminar, but Okrent definitely started *Rotisserie League Baseball*.[83] Okrent claims to have thought of the idea for *Rotisserie League Baseball* on a plane, though the name comes from La Rotisserie Francaise, a former restaurant in Manhattan, where the league's competitors would meet each year to draft their teams.[84] Okrent's game was designed for his group of friends who enjoyed the minutia of baseball statistics and reading box scores on the morning after.[85] A monumental change would overtake the fantasy sports industry with the rise in access to the Internet.[86] By 2010, fantasy sports had expanded beyond circles of friends who would meet to draft teams, with an estimated 30 million Americans participating in some type of fantasy

---

[78] Marc Edelman, *A Short Treatise on Fantasy Sports and the Law: How America Regulates its New National Pastime*, 3 HARV. J. SPORTS & ENT. L. 1, 4 (2012).

[79] Patrick Hruby, *The Founding Fathers of Fantasy,* SPORTS ON EARTH (Dec. 2, 2013), http://www.sportsonearth.com/article/64244480/the-founding-fathers-of-fantasy.

[80] Marc Edelman, *Navigating the Legal Risks of Daily Fantasy Sports: A Detailed Primer in Federal and State Gaming Law*, 2016 U. ILL. L. REV. 117, 120-27 (2016).

[81] Marc Edelman, *Navigating the Legal Risks of Daily Fantasy Sports: A Detailed Primer in Federal and State Gaming Law*, 2016 U. ILL. L. REV. 117, 120-27 (2016).

[82] Marc Edelman, *Navigating the Legal Risks of Daily Fantasy Sports: A Detailed Primer in Federal and State Gaming Law*, 2016 U. ILL. L. REV. 117, 120-27 (2016).

[83] Robert Lipsyte, *Backtalk; For the Founding Father of Fantasy Baseball, a Reality Check*, N.Y. TIMES (Mar. 31, 1996), https://www.nytimes.com/1996/03/31/sports/backtalk-for-the-founding-father-of-fantasy-baseball-a-reality-check.html.

[84] Robert Lipsyte, *Backtalk; For the Founding Father of Fantasy Baseball, a Reality Check*, N.Y. TIMES (Mar. 31, 1996), https://www.nytimes.com/1996/03/31/sports/backtalk-for-the-founding-father-of-fantasy-baseball-a-reality-check.html.

[85] Robert Lipsyte, *Backtalk; For the Founding Father of Fantasy Baseball, a Reality Check*, N.Y. TIMES (Mar. 31, 1996), https://www.nytimes.com/1996/03/31/sports/backtalk-for-the-founding-father-of-fantasy-baseball-a-reality-check.html.

[86] BRETT HUTCHINS & DAVID ROWE, SPORT BEYOND TELEVISION: THE INTERNET, DIGITAL MEDIA AND THE RISE OF NETWORKED MEDIA SPORT 167 (2012).

11

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

sports.[87] Accompanying the rise of fantasy sports was an ancillary industry of supporting materials, like draft guides, which had swelled to revenue of $800 million annually.[88] The rise of fantasy sports, however, would be sent into overdrive following the passage of a banking statute that was attached as a rider to a port security bill in 2006.[89]

## B.    Emergence of UIGEA

Beginning in 1997, Congress started to hold hearings regarding internet gambling, with particular concern about the rapid proliferation of offshore poker and sports betting sites that conducted business via the Internet in the United States, despite longstanding federal and state laws that disallowed various forms of gambling.[90]  In 2006, Congress passed the Unlawful Internet Gambling Enforcement Act, which allowed the Department of Justice to more easily pursue legal action against companies that conducted gambling operations over the Internet, as well as those payment processors who transmitted funds related to these activities.[91]  The goal of implementing a new federal gambling law that was targeted at payment processors, as well as gambling companies themselves, was to "cut off the head of the funding regime for illegal gambling" when the companies were located overseas and outside the scope of reasonable extradition to face charges for their illegal gambling activities.[92]

Nevertheless, there were some concerns among lobbyists within the professional sports industry that a change in federal law could harm the traditional fantasy sports marketplace – either by deterring large companies, such as CBS Sports, from hosting traditional fantasy sports games, or by cutting off the online processing of payments related to these games.  The suggestion that fantasy sports was different came from a lobbyist for the Major League Baseball Players' Association, Marianne McGettigan, who stressed that baseball fans who played fantasy sports were amongst the league's most engaged fans and that no one would attempt to manipulate the outcome of a baseball game, or go into debt over fantasy baseball, because the stakes were too low.[93] McGettigan's testimony to Congress planted the idea that fantasy sports were different from

---

[87] BRETT HUTCHINS & DAVID ROWE, SPORT BEYOND TELEVISION: THE INTERNET, DIGITAL MEDIA AND THE RISE OF NETWORKED MEDIA SPORT 167 (2012).
[88] BRETT HUTCHINS & DAVID ROWE, SPORT BEYOND TELEVISION: THE INTERNET, DIGITAL MEDIA AND THE RISE OF NETWORKED MEDIA SPORT 167 (2012).
[89] See Brant M. Leonard, Highlighting The Drawbacks of the UIGEA: Proposed Rules Reveal Heavy Burdens, 57 DRAKE L. REV. 515 (2008).
[90] Marc Edelman, Keynote Address: A Sure Bet? The Legal Status of Daily Fantasy Sports, 5 PACE INTELL. PROP., SPORTS & ENT. L.F. 1, 5 (2016).
[91] Marc Edelman, Keynote Address: A Sure Bet? The Legal Status of Daily Fantasy Sports, 5 PACE INTELL. PROP., SPORTS & ENT. L.F. 1, 5 (2016).
[92] Marc Edelman, Keynote Address: A Sure Bet? The Legal Status of Daily Fantasy Sports, 5 PACE INTELL. PROP., SPORTS & ENT. L.F. 1, 5 (2016).
[93] John T. Holden, The Unlawful Internet Gambling Enforcement Act and the Exemption for Fantasy Sports, 28 J. LEGAL ASPECTS SPORT 97, 104-105 (2018).

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ____ (2020).

gambling and thus Congress began drafting internet gambling legislation with exemptions for certain types of fantasy sports games.[94]

Indeed, when Congress passed the UIGEA in 2006, the new federal anti-gambling law included several special exemptions, including one in particular for "fantasy sports." Specifically exempted from the definition of a "bet or wager" under the act were the following:

(ix) participation in any fantasy or simulation sports game or educational game or contest in which (if the game or contest involves a team or teams) no fantasy or simulation sports team is based on the current membership of an actual team that is a member of an amateur or professional sports organization (as those terms are defined in section 3701 of title 28) and that meets the following conditions:

(I) All prizes and awards offered to winning participants are established and made known to the participants in advance of the game or contest and their value is not determined by the number of participants or the amount of any fees paid by those participants;

(II) All winning outcomes reflect the relative knowledge and skill of the participants and are determined predominantly by accumulated statistical results of the performance of individuals (athletes in the case of sports events) in multiple real-world sporting or other events; and

(III) No winning outcome is based—

(aa) on the score, point-spread, or any performance or performances of any single real-world team or any combination of such teams; or

(bb) solely on any single performance of an individual athlete in any single real-world sporting or other event.[95]

Although this language in the UIGEA was intended to insulate the traditional full-season fantasy sports, it also planted the seed for individuals to attempt to muddy the waters between these activities and games that looked somewhat closer to traditional sports gambling.[96] This muddying began in earnest in 2007, when Kevin Bonnet, a blogger who wrote about poker for a living, read the UIGEA carve-out and conceived of creating a website that looked like a sportsbook, but tasked participants with picking players that they thought would perform statistically well over a given day, rather than predicting the results of individual sports games or events within these games.[97]

---

[94] John T. Holden, *The Unlawful Internet Gambling Enforcement Act and the Exemption for Fantasy Sports*, 28 J. LEGAL ASPECTS SPORT 97, 106 (2018). *See also Internet Gaming Hearing before the Committee on Indian Affairs on S. 692.* 106th Cong. (Statement of Assistant Attorney General Kevin DiGregory) (1999). (DiGregory observed that exemptions for fantasy sports, and other activities threatened to defeat the intent of the prohibition.).
[95] 31 U.S.C. § 5362 (E)(ix) (2006).
[96] Marc Edelman, *Keynote Address: A Sure Bet? The Legal Status of Daily Fantasy Sports*, 5 PACE INTELL. PROP., SPORTS & ENT. L.F. 1, 6 (2016).
[97] Marc Edelman, *Keynote Address: A Sure Bet? The Legal Status of Daily Fantasy Sports*, 5 PACE INTELL. PROP., SPORTS & ENT. L.F. 1, 6 (2016).

13

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

Bonnet, who was not a lawyer and presumably lacked any formal legal training, purported to the public that his new type of gaming activity would comply with the UIGEA carve-out for "fantasy sports" because his activity was based on predicting players' outcomes rather than outcomes of teams.[98]   In an attempt to further buttress his argument, he named his new activity "daily fantasy sports" to acknowledge both the purported similarity and differences in his contests from the recognized forms of fantasy sports that were intended to fall within the UIGEA carve-out.[99] While Kevin Bonnet's website never received much traction and was eventually closed due to lack of funding, by 2010 a more sophisticated group of executives from Scotland launched a series of similar contests in the U.S. market under the brand name FanDuel, and similarly adopted the moniker of "daily fantasy sports."[100] Within a few years thereafter, DraftKings launched in the same category and quickly emerged as FanDuel's prime competitor for market share upon reaching a then-secret cooperative agreement with Major League Baseball Advanced Media.[101] Historically, federal regulations have played a supporting role to state law gambling laws.[102]

## C.    Gambling under State Law

The categorization of gambling is a matter that has historically been the responsibility of the states.[103] Gambling contains three elements: a prize, some degree of chance, and consideration.[104] Thus, for contests that include an entry fee and a prize, the determining factor of whether an activity is lawful typically hinges on the degree of chance involved in the game.[105] There are a number of different tests that a given state could apply to determine as much.  The most broadly applied test, which is used in a majority of states, is referred to as the dominant factor (or predominant factor) test.[106] Under the dominant factor test, a game will be found to be permissible if a player's skill is at least 51% responsible for the game's outcome.[107] A second test, known as the material element test, determines whether a contest is one of chance by assessing

---

[98] Marc Edelman, *Keynote Address: A Sure Bet? The Legal Status of Daily Fantasy Sports*, 5 PACE INTELL. PROP., SPORTS & ENT. L.F. 1, 6 (2016).

[99] Marc Edelman, *Keynote Address: A Sure Bet? The Legal Status of Daily Fantasy Sports*, 5 PACE INTELL. PROP., SPORTS & ENT. L.F. 1, 6 (2016).

[100] Marc Edelman, *Keynote Address: A Sure Bet? The Legal Status of Daily Fantasy Sports*, 5 PACE INTELL. PROP., SPORTS & ENT. L.F. 1, 6 (2016).  *See also* Darren Heitner, *An Abbreviated History of FanDuel and DraftKings*, FORBES (Sept. 20, 2015), https://www.forbes.com/sites/darrenheitner/2015/09/20/an-abbreviated-history-of-fanduel-and-draftkings/#339f9d0b7564.

[101] Eric Fisher, *A look into DraftKings' MLB deal*, SPORTS BUS. J. (Apr. 20, 2015), https://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/Media/DraftKings-MLB.aspx.

[102] *See* G. Robert Blakey & Harold A. Kurland, *The Development of the Federal Law of Gambling*, 63 CORNELL L. REV. 924 (1978).

[103] *See* Anthony G. Galasso, Jr., *Betting Against the House (and Senate): The Case for Legal, State-Sponsored Sports Wagering in a Post-PASPA World*, 99 KY. L. J. 163 (2010). This fact is also codified in the Interstate Horse Racing Act of 1978. *See* 15 U.S.C. § 3001(a)(1) (1978) ("the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders;").

[104] *See* Anthony N. Cabot et al., *Alex Rodriguez, a Monkey, and the Game of Scrabble: The Hazard of Using Illogic to Define the Legality of Games of Mixed Skill and Chance*, 57 DRAKE L. REV. 383, 390 (2009).

[105] *Id.*

[106] *See* Jeffrey C. Meehan, *The Predominate Goliath: Why Pay-to-Play Daily Fantasy Sports Are Games of Skill Under the Dominant Factor Test*, 26 MARQ. SPORTS L. REV. 5, 15 (2015).

[107] *Id* at 16.

14

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ____ (2020).

whether there is more than a small amount of chance involved in the game.[108] Chance may serve as a material element of a contest even if the ratio of skill to chance were less than 51%. Meanwhile, a few states apply a test that disallows any chance whatsoever in determining the contest's outcome.[109] The any chance test is the strictest of the applied tests, and even common activities like a trivia game with multiple choice answers would fail the test if the elements of consideration and a prize were met, as there would be 25 percent chance of guessing the right answer if four options were provided.[110] States that applied the any chance test were amongst those that most of the boldest DFS companies did not dare challenge, and players in states like Arizona and Louisiana, who apply the any chance test, were forbidden from participating in contests.[111] There are also several jurisdictions that may apply a fourth test, the gambling instinct test, which is the only means of categorizing an activity without relying on the degree of chance involved.[112] The gambling instinct test prohibits gambling activities that appeal to a player's desire to engage in gambling behaviors, without regard for skill or chance.[113] Beginning early in their existence, DraftKings and FanDuel began the process of touting their games as being games of skill, which they connected with an exemption in the Unlawful Internet Gambling Enforcement Act (UIGEA) for certain fantasy sports contests where skill is a determining factor in the outcome.[114] The issue was that the UIGEA was a federal banking statute with a rule of construction stating: "No provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States."[115]

---

[108] Anthony N. Cabot et al., *Alex Rodriguez, a Monkey, and the Game of Scrabble: The Hazard of Using Illogic to Define the Legality of Games of Mixed Skill and Chance*, 57 DRAKE L. REV. 383, 392 (2009).

[109] Anthony N. Cabot et al., *Alex Rodriguez, a Monkey, and the Game of Scrabble: The Hazard of Using Illogic to Define the Legality of Games of Mixed Skill and Chance*, 57 DRAKE L. REV. 383, 39s (2009).

[110] Anthony N. Cabot et al., *Alex Rodriguez, a Monkey, and the Game of Scrabble: The Hazard of Using Illogic to Define the Legality of Games of Mixed Skill and Chance*, 57 DRAKE L. REV. 383, 392 (2009).

[111] *See* Chris Grove, *What Are The States Where You Can Play Daily Fantasy Sports?*, LEGAL SPORTS REP. (Updated Jan. 1, 2019), https://www.legalsportsreport.com/daily-fantasy-sports-blocked-allowed-states/.

[112] Anthony N. Cabot et al., *Alex Rodriguez, a Monkey, and the Game of Scrabble: The Hazard of Using Illogic to Define the Legality of Games of Mixed Skill and Chance*, 57 DRAKE L. REV. 383, 393-394 (2009).393-394.

[113] Anthony N. Cabot et al., *Alex Rodriguez, a Monkey, and the Game of Scrabble: The Hazard of Using Illogic to Define the Legality of Games of Mixed Skill and Chance*, 57 DRAKE L. REV. 383, 392 (2009).. Cabot et al. cite *City of Milwaukee v. Burns*, 274 N.W. 273, 275 (Wis. 1937), which conjured up the gambling instinct test in respect to pinball machines, stating: "The machine makes an appeal to the gambling instinct, because the player has constantly before him the chance that the next play will assure him of the right on the next succeeding play to secure from 2 to 20 checks. Were it not for this appeal to the gambling instinct, these machines, which attempt to adhere to the letter of the law while violating its spirit, would never have been placed upon the market."

[114] The Fantasy Sports Trade Association, who was the advocacy group representing FanDuel and DraftKings, postulated that fantasy sports were a game of skill, and therefore not gambling, citing UIGEA "specifically exempts fantasy sports games, educational games or any online contest that 'has an outcome that reflects the relative knowledge of the participants, or their skill at physical reaction or physical manipulation (but not chance), and, in the case of a fantasy or simulation sports game, has an outcome that is determined predominantly by accumulated statistical results of sporting events, including any non-participant's individual performances in such sporting events…'" *See* FANTASY SPORTS TRADE ASSOC., *Why Fantasy Sports Is Not Gambling: Understanding A Game of Skill* (last visited Jan. 30, 2019), https://fsta.org/research/why-fantasy-sports-is-not-gambling/.

[115] 31 U.S.C. § 5361 (b) (2006).

15

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

Although this reading leaves open the possibility that the UIGEA may be used to explain other statutes, it did not explicitly override them.[116]

Even though the UIGEA, as drafted, did not explicitly modify any other laws, this still did not stop FanDuel, DraftKings, and the Fantasy Sports Trade Association from acting as though the statute had a preemptive effect. By the time states were ready to rein in the games, the two major companies had already acquired millions of customers using the UIGEA as a shield.[117]

## D.    Legal Troubles?

On October 6, 2015, the *New York Times* reported that the New York Attorney General had launched an inquiry into both DraftKings and FanDuel.[118] The inquiry was prompted by the revelation that DraftKings and FanDuel had allowed their employees to play on each other's sites, as well as concern about whether the underlying contests themselves violated New York State's gambling laws. The Attorney General's inquiry requested details regarding storage and access to information that might be useful for an employee competing on a competitor's site.[119] As news of the New York investigation began to emerge, more details of potential improprieties by employees at FanDuel and DraftKings surfaced and so did questions about the legality of DFS as a whole.[120] Soon after, the New York Attorney General filed a lawsuit against FanDuel and DraftKings accusing them of illegal sports betting and fraudulent advertising.

Following the launch of the investigation by the New York Attorney General's office, state officials across the country began to investigate whether DFS was legal under state laws. Beginning on December 23, 2015, with a letter from Illinois Attorney General Lisa Madigan to state representatives declaring that DFS was illegal gambling under Illinois law, DFS became a target.[121] The Madigan opinion was joined by Attorneys General opinions from Hawaii,[122]

---

[116] 31 U.S.C. § 5361 (b) (2006).

[117] For an overview of the size of the DFS industry just prior to the launch of sports wagering outside of Nevada *see* Eric Ramsey, *DraftKings, FanDuel Generated About $220 Million In Entry Fees In May*, LEGAL SPORTS REP. (June 7, 2018), https://www.legalsportsreport.com/20932/daily-fantasy-sports-data-may-2018/.

[118] Joe Drape & Jacqueline Williams, *New York Attorney General Opens Inquiry Into Fantasy Sports Sites*, N.Y. TIMES (Oct. 6, 2015), https://www.nytimes.com/2015/10/07/sports/draftkings-fanduel-inquiry-new-york-attorney-general.html?smid=tw-bna&_r=1.

[119] Joe Drape & Jacqueline Williams, *New York Attorney General Opens Inquiry Into Fantasy Sports Sites*, N.Y. TIMES (Oct. 6, 2015), https://www.nytimes.com/2015/10/07/sports/draftkings-fanduel-inquiry-new-york-attorney-general.html?smid=tw-bna&_r=1.

[120] John T. Holden et al., *Daily Fantasy, Tipping, and Wire Fraud Vulnerability*, 21 GAMING L. REV. & ECON. 8 (2017).

[121] Ill. AGO Op. File No. 15-006 (Dec. 25, 2015), *available at* https://www.legalsportsreport.com/wp-content/uploads/2015/12/Illinois-DFS.pdf.

[122] Haw. AGO Op. No. 16-1 (Jan. 27, 2016), *available at* http://ag.hawaii.gov/wp-content/uploads/2016/01/News-Release-2016-2.pdf

16

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Forthcoming 57 American Business Law Journal ___ (2020).

Mississippi,[123] Nevada,[124] Tennessee,[125] and Texas, all finding that DFS is gambling under state law.[126] A number of states including Kansas,[127] Rhode Island,[128] and West Virginia have made determinations that DFS was lawful under state laws.[129] Meanwhile, a handful of other states have received opinions that it is unclear whether DFS is illegal gambling under state law including: Connecticut,[130] Ohio,[131] and South Dakota.[132] Despite the negative findings by the various state chief law enforcement officials, FanDuel and DraftKings currently operate in all states except Alabama, Arizona, Hawaii, Idaho, Iowa, Louisiana, Montana, Nevada, and Washington.[133] In addition, FanDuel had long resisted operating in Texas after the Attorney General's opinion was released, however, after a two-year absence, they reentered the market in August 2018.[134]

Despite various decisions that would seemingly make most legally reasonable DFS companies steer clear of a number of states, both DraftKings and FanDuel continued to push the envelope of not only UIGEA and federal law, but also the will of various state level authorities to

[123] Miss. AGO Op. Re: Fantasy Sports Wagering in the state of Mississippi (Jan. 29, 2016), *available at* *https://www.legalsportsreport.com/wp-content/uploads/2016/01/A.Godfrey_Jan.29-2016-Fantasy-Sports-Wagering-in-the-state-of-Mississippi.pdf.* This opinion was later rendered moot by a superseding law passed later in 2016. *See* Dustin Gouker, *Mississippi Becomes Latest State To Enact Fantasy Sports Law,* LEGAL SPORTS REP. (May 13, 2016), https://www.legalsportsreport.com/10012/mississippi-governor-signs-dfs-bill/.

[124] Memorandum from J. Brin Gibson, Bureau Chief of Gaming & Gov't Affairs & Ketan D. Bhirud, Head of Complex Litig. to A.G. Burnett, Chairman, Nev. Gaming Control Bd., Terry Johnson, Member, Nev. Gaming Control Bd. & Shawn Reid, Member, Nev. Gaming Control Bd., Memorandum: Legality of Daily Fantasy Sports Under Nevada Law (Oct. 16, 2015), *available at* http://www.legalsportsreport.com/wp-content/uploads/2015/10/Nevada-AG-DFS.pdf. (Nevada declared that DFS was a type of gambling that was subject to Nevada's licensing requirements like other types of sports wagering).

[125] Tenn. AGO Op. No. 16-13 (Apr. 5, 2016), *available at* https://www.legalsportsreport.com/wp-content/uploads/2016/04/Tennessee-TN-AG-Opinion-DFS-April-2016.pdf.

[126] Tex. AGO Op. No. KP-0057 (Jan. 19, 2016), *available at* https://www.legalsportsreport.com/wp-content/uploads/2016/01/Texas-ag-dfs-decision.pdf.

[127] Ks. AGO Op. No. 2015-9 (Apr. 24, 2015), *available at* https://www.legalsportsreport.com/wp-content/uploads/2015/04/2015-009.pdf.

[128] RI AGO Op. Re: Daily Fantasy Sports (Feb. 4, 2016), https://www.legalsportsreport.com/wp-content/uploads/2016/02/Rhode-Island-DFS-Opinion.pdf.

[129] *See* Dustin Gouker, *West Virginia Attorney General On Fantasy Sports: State 'Does Not Prohibit' Contests*, LEGAL SPORTS REP. (July 11, 2016), https://www.legalsportsreport.com/10703/fantasy-sports-west-virginia-legality/.

[130] *See* Dustin Gouker, *Attorney General Opinions on Daily Fantasy Sports*, LEGAL SPORTS REP. (last updated Mar. 1, 2019), https://www.legalsportsreport.com/state-legality-of-dfs/.

[131] Oh. AGO Op. Re: Daily Fantasy Sports Websites (June 30, 2016), *available at* https://www.legalsportsreport.com/wp-content/uploads/2016/09/2016-06-30-Memo-to-Sen.-Coley-re-Daily-Fantasy-Sports-Websites.pdf.

[132] *See* Dustin Gouker, *South Dakota's AG On Daily Fantasy Sports: Won't Pursue Indictments, Will Consider 'Civil Remedies',* LEGAL SPORTS REP. (Dec. 7, 2015), https://www.legalsportsreport.com/6735/south-dakota-jackley-on-dfs/.

[133] FANDUEL, *Restricted Location* (Last accessed Dec. 17, 2018), https://www.fanduel.com/p/RestrictedLocation.

[134] Chris Grove, *FanDuel Returns To Texas Fantasy Sports Market After Two-Year Absence,* LEGAL SPORTS REP. (Aug. 28, 2018), https://www.legalsportsreport.com/23349/fanduel-texas-return/; *see also* Chris Grove, *What Are The States Where You Can Play Daily Fantasy Sports?,* LEGAL SPORTS REP. (last visited Dec. 17, 2018), https://www.legalsportsreport.com/daily-fantasy-sports-blocked-allowed-states/.

17

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ____ (2020).

come and stop them.[135] Indeed, one of the core advantages for both companies was their risk tolerance, irrespective of the legal soundness (or lack thereof) of this approach.

## III. DraftKings and FanDuel's Messaging

While many would have expected the aggressive legal approach adopted by DraftKings and FanDuel would prove to be these companies' undoing, nearly a year after then-New York Attorney General Schneiderman commenced his lawsuit against these companies, the Attorney General's office announced a $12 million settlement with the two companies ($6 million each).[136] The settlement came as the two companies were purportedly running out of money based on their hefty legal bills.[137]  Prior to the settlement in New York, the case generated a great deal of material regarding how FanDuel and DraftKings strategically categorized their product as similar to, and distinct from, gambling. We examined how the two companies used their legal filings in New York, as well as various other business and marketing communications, to strategically categorize themselves in order to create opportunities for regulatory arbitrage.[138]

### A.    The Sources

In order to analyze the messaging by DraftKings and FanDuel we collected the statements made in association with NYAG cases against the two companies, as well as congressional testimony surrounding the industry.[139] In addition to the testimony 40 television commercials from the companies were examined to analyze how the messaging evolved, and what messages were

---

[135] *See e.g.,* Jill R. Dorson, *Angered By Proposal, Comments, DraftKings Says Illinois Amendment Would Stifle Competition*, SPORTS HANDLE (Mar. 29, 2019), https://sportshandle.com/illinois-sports-betting-draftkings-fanduel/.

[136] David Purdum, *DraftKings, FanDuel will pay $6M each in settlement of N.Y. suit*, ESPN (Oct. 25, 2016), http://www.espn.com/chalk/story/_/id/17886248/draftkings-fanduel-pay-6-million-settlement-ny-suit.

[137] Merrit Kennedy, *Daily Fantasy Sports Sites DraftKings And FanDuel Agree To Merge*, NPR (Nov. 18, 2016), https://www.npr.org/sections/thetwo-way/2016/11/18/502563390/daily-fantasy-sports-sites-draftkings-and-fanduel-agree-to-merge.

[138] Following the settlement in New York, the legislature passed a law declaring DFS lawful. This law has, however, since been overturned by the New York Supreme Court, who declared DFS illegal gambling in the state. The ruling has been stayed pending an appeal, and both DraftKings and FanDuel continue to operate in the state at the time of writing. Eric Ramsey, *Judge: New York Daily Fantasy Sports Are Illegal Gambling; What's Next For DraftKings, FanDuel?*, LEGAL SPORTS REP. (Oct. 29, 2018), https://www.legalsportsreport.com/25363/judge-new-york-daily-fantasy-sports-illegal-gambling-whats-next-draftkings-fanduel/; *see also* Zachery Zagger, *NY Daily Fantasy Sports In Jeopardy After Gambling Ruling*, LAW 360 (Oct. 31, 2018), http://www.kleinmoynihan.com/13136-2/.

[139] People by Schneiderman v. FanDuel, 453056/2015, (N.Y. Sup. Ct. 2015); People by Schneiderman v. DraftKings, 453054/2015 (N.Y. Sup. Ct. 2015); *see also Hearing Before the House Subcommittee on Commerce, Manufacturing, & Trade on Daily Fantasy Sports: Issues and Perspectives*, 114th Cong. (May 11, 2016). As our focus was on the messaging that originated from the examination of how the companies positioned themselves, we were not focused on secondary analyses of DraftKings and FanDuel's positioning such as lucking at media accounts, though we note there were numerous media articles, which questioned whether DFS was a form of gambling. *See e.g.,* Walt Bogdanich & Jacqueline Williams, *For Addicts, Fantasy Sites Can Lead to Ruinous Path*, N.Y. TIMES (Nov. 22, 2015), https://www.nytimes.com/2015/11/23/sports/fantasy-sports-addiction-gambling-draftkings-fanduel.html; *see also* Sacha Feinman & Josh Israel, *The Hot New Form of Fantasy Sports Is Probably Addictive, Potentially Illegal and Completely Unregulated*, THINK PROGRESS (May 7, 2015), https://thinkprogress.org/the-hot-new-form-of-fantasy-sports-is-probably-addictive-potentially-illegal-and-completely-4c90c89db63b/.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

being sent to consumers, versus what messages were being sent to regulators.[140] We were able to construct a timeline, identifying five key, distinct eras for DFS corporate communications. The first era includes the period from the early commercialization of FanDuel and DraftKings until the NYAG's launch of its investigation against these companies.[141] The second era includes the period between October 2015 and October 2016, which marks the time from the beginning of the NYAG cases to settlement.[142] The third era represents the relatively quiet period after the settlements in October 2016, until the blockings of a proposed merger between the two companies in July 2017.[143] The fourth era occurred between July 2017 and the Supreme Court's decision in *Murphy,* which allowed states to begin legalizing sports wagering within their borders.[144] The final era included the period following the Supreme Court's decision until January 2019.

DraftKings and FanDuel categorized themselves differently, at different times, for different audiences. Initially, prior to the NYAG's legal action against these two companies, DraftKings and FanDuel appeared to use associations with sports betting and gambling to attract customers and gain investment. However, during the period surrounding the New York gambling litigation, DraftKings and FanDuel re-categorized themselves as distinct from sports betting and gambling products. They also changed their advertising to avoid sports betting connotations. After the court case, both companies left the public spotlight, perhaps prompted by concerns about further litigation, the desire to merge, and shortfall of capital.[145] When they replenished their coffers, DraftKings and FanDuel returned to their initial strategy of drawing associations to gambling to attract customers. Finally, with the Supreme Court declaring PASPA unconstitutional, the

---

[140] To examine these questions, we employed an inductive strategy based on the Gioia methodology. *See* Dennis A. Gioia et al., *Seeking Qualitative Rigor in Inductive Research: Notes on the Gioia Methodology*, 16 ORG. RES. METHODS 15 (2012). Inductive strategies are appropriate for this type of examination because of the lack of existing studies and existing information related to the subject matter; in this case, the categorization strategies of DraftKings and FanDuel. *See* Dennis A. Gioia et al., *Seeking Qualitative Rigor in Inductive Research: Notes on the Gioia Methodology*, 16 ORG. RES. METHODS 15 (2012); *see also* BENT FLYVBJERG, THE SAGE HANDBOOK OF QUALITATIVE RESEARCH 301 (Norman K. Denzin & Yvonna S. Lincoln eds., 4th ed. 2011). Our analysis of the advertising codes had a *Guetzkow's U* of .061, and our analysis of the materials from the NYAG cases had a *Guetzkow's U* of .013. These results suggest that the coders had a high degree of consistency in how they coded the materials, despite the coding taking place independently. *See* Laurie R. Weingart et al., *Conflicting Social Motives in Negotiating Groups*, 93 J. PERSONALITY & SOC. PSYCH. 994 (2007). As a second check on intercoder reliability we calculated *Krippendorf's alpha*, a measure of greater than .8 suggests high levels of reliability. Our advertising codes had a score of .852 and our NYAG cases codes had a score of .896, both of which indicate that there was substantial agreement as to how the materials was coded regardless of who was coding. *See* Andrew F. Hayes & Klaus Krippendorf, *Answering the Call for a Standard Reliability Measure for Coding Data*, 1 COMM. METHODS & MEASURES 77 (2007).

[141] For an overview of this time period *see* Marc Edelman, *Navigating the Legal Risks of Daily Fantasy Sports: A Detailed Primer in Federal and State Gaming Law*, 2016 U. ILL. L. REV. 117, 120-27 (2016).

[142] *See* Daniel Roberts, *The War Between DraftKings and FanDuel and the NY Attorney General is Over*, YAHOO (Oct. 25, 2016), https://finance.yahoo.com/news/the-war-between-draftkings-and-fanduel-and-the-ny-attorney-general-is-over-215021442.html.

[143] Alex Zietlow, *Fantasy Meets Reality as FTC Puts DraftKings, FanDuel Sports Merger on Ice,* WASH. TIMES (July 4, 2017), https://www.washingtontimes.com/news/2017/jul/4/draftkings-fanduel-fantasy-sports-merger-blocked/.

[144] John T. Holden, *Prohibitive Failure: The Demise of the Ban on Sports Betting*, 35 GA. ST. U. L. REV. 329 (2019).

[145] Emmett Knowlton, *One year after taking over the fantasy world, DraftKings and FanDuel are reportedly running out of cash and can't pay their vendors*, BUS. INSIDER (Oct. 24, 2016), https://www.businessinsider.com/draftkings-and-fanduel-reportedly-running-out-of-cash-and-cant-make-payments-2016-10.

19

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ____ (2020).

companies unabashedly promoted their newly launched sports betting apps, and created fantasy contests that did not comply with the UIGEA including single-game contests.[146]

Surviving during the tumultuous period surrounding the NYAG case was purportedly difficult.[147] According to one report published in *Reuters*, DraftKings and FanDuel were reported to be running several days behind on paying winning players who sought to cash out their accounts.[148] In the uncertain era between the resolution of the NYAG case and the Supreme Court's decision in *Murphy,* both DraftKings and FanDuel sought to generate additional capital by passing costs on to consumers and raising the "rake" or the amount that the house keeps, regardless of the outcome of a bet.[149] The companies' struggles continued through to the early part of 2018, having "churned" 85 percent of their customers, meaning DraftKings and FanDuel had paid to acquire the customers, had them play, and then had them discontinue play.[150]

Nevertheless, fluid categorization allowed DraftKings and FanDuel to avoid regulatory costs for a period of time by delaying their detection by regulators as potentially illegal forms of gambling under then-existing law. Fluid categorization also introduced risk to business partners, who were uncertain how the courts would categorize DFS and were worried they may also be found culpable.[151] Ultimately, DraftKings and FanDuel emerged better positioned than any other company to truly operate as sports betting entities in the U.S. when the Supreme Court opened the doors for legal sports betting.[152] Indeed, it was likely a combination of good fortune, lax regulatory enforcement, incredibly successful and expensive lobbying efforts, and tremendous risk-taking that allowed the two DFS giants to survive just long enough to see a new window for raising capital. These were not options available to smaller or more risk averse DFS companies that entered the marketplace at around the same time and had placed a greater emphasis on trying to comply with somewhat opaque black letter law than trying to categorize themselves in ways that give the semantic impression of being immune to the law. For this reason, some might even say that successful categorization allowed the bad actors to win.

---

[146] *See* Matt LaMarca, *How Does the Single-Game NBA Format on FanDuel Differ From DraftKings?*, FANTASY LABS (Apr. 4, 2019), https://www.fantasylabs.com/articles/fanduel-nba-dfs-single-game-slate-strategy-format/.

[147] ASSOCIATED PRESS, *DraftKings and FanDuel Call Off Merger*, N.Y. TIMES (July 13, 2017), https://www.nytimes.com/2017/07/13/sports/draftkings-and-fanduel-call-off-merger.html.

[148] Michael Erman, *FanDuel runs 2 to 3 days behind paying out players*, REUTERS (Nov. 16, 2015), https://www.reuters.com/article/us-fantasysports-new-york-fanduel/fanduel-runs-2-to-3-days-behind-paying-out-players-idUSKCN0T526320151116.

[149] Dustin Gouker, *Rake Goes Up At DraftKings, FanDuel For NFL Week 4, And Users Aren't Happy*, LEGAL SPORTS REP. (Sep. 26, 2017), https://www.legalsportsreport.com/15721/draftkings-fanduel-rake-increases/.

[150] Darren Heitner, *Former Investment Darlings DraftKings And FanDuel Are Struggling To Grow*, FORBES (Feb. 14, 2018), https://www.forbes.com/sites/darrenheitner/2018/02/14/former-investment-darlings-draftkings-and-fanduel-are-struggling-to-grow/#2a851e22269e.

[151] *See e.g.,* Dustin Gouker, *Why Disney's DraftKings Investment Deal Didn't Happen: DFS An 'Adult Product,' Not A Good Fit*, LEGAL SPORTS REP. (July 13, 2015), https://www.legalsportsreport.com/2310/disney-draftkings-no-investment-deal/.

[152] Adam Candee, *Race Between FanDuel, DraftKings Heats Up As NJ Sports Betting Handle Passes $1 Billion*, LEGAL SPORTS REP. (Jan. 14, 2019), https://www.legalsportsreport.com/27608/nj-sports-betting-revenue-december-2018/.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

### B.        Before the New York Lawsuit: 2009 to October 2015

One can clearly observe the different communications strategies implemented by DraftKings an FanDuel across five different time frames—categorizing these companies' attempts to use regulatory arbitrage behaviors to self-categorize in a manner that best met their interests for that specific time period. During the early period of DFS which extended up until the NYAG's investigation and ultimate lawsuit against FanDuel and DraftKings, both daily fantasy companies—and most notably DraftKings—self-categorized as being akin to sports betting.[153] This self-categorization is observable in a number of ways.  For example, in a Reddit post, Jason Robins, CEO of DraftKings, stated:

> The concept is different from traditional fantasy leagues. Our concept is a mashup between poker and fantasy sports. Basically, you pick a team, deposit your wager, and if your team wins, you get the pot. Fantasy sports has a carve-out from the 2006 gambling regulation because it's considered a game of skill. This concept where you can basically "bet" your team will win is new and different from traditional leagues that last the entire season.[154]

By categorizing DraftKings as a "mashup between poker and fantasy sports" with "wagers" and "pots", Robins was able to easily communicate his product using the pre-existing category of gambling.[155]  Robins and DraftKings also used gambling categorization to acquire customers. In a 2014 interview, Robins explained:

> So[,] if you go and play DraftKings, it actually in many ways has a similar feel to poker. The games have payout structures that are similar and there's a lot of different variety; we can play head to head, we have larger tournaments. So[,] if you basically take anybody who is into poker, who is a poker fan; they also happen to like sports. It's a very natural fit. There's lots of people who like sports. So being able to go to the poker market and attract customers there has led us to a lot of great customers acquisition. I think for a poker player, it is just much easier to immediately get and understand the product. It is just a great place for us to advertise.[156]

In the same interview, he elaborated:

---

[153] Hayden Bird, *A DraftKings Founder Used the Terms 'Bet' & 'Casino' to Explain the Site in a Reddit AMA*, BOSTINNO (Oct. 18, 2015), https://www.americaninno.com/boston/a-draftkings-founder-used-the-terms-bet-casino-to-explain-site-in-a-reddit-ama/.

[154] *See* Hayden Bird, *A DraftKings Founder Used the Terms 'Bet' & 'Casino' to Explain the Site in a Reddit AMA*, BOSTINNO (Oct. 18, 2015), https://www.americaninno.com/boston/a-draftkings-founder-used-the-terms-bet-casino-to-explain-site-in-a-reddit-ama/.

[155] *See* Hayden Bird, *A DraftKings Founder Used the Terms 'Bet' & 'Casino' to Explain the Site in a Reddit AMA*, BOSTINNO (Oct. 18, 2015), https://www.americaninno.com/boston/a-draftkings-founder-used-the-terms-bet-casino-to-explain-site-in-a-reddit-ama/.

[156] Becky Liggero, *Interview with Jason Robins of DraftKings*, CALVIN AYRE (Nov. 26, 2014), https://calvinayre.com/2014/11/26/sports/interview-with-jason-robins-of-draftkings-bl-video/.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

> We found that our product is very complimentary to other forms of gaming in the sports world whether it's sports betting or traditional season-long fantasy sports. We conducted market research and have seen data that suggest that people actually increase their level of participation on those other things as they get into daily fantasy.[157]

Consistent with Robins's statements, advertising during this era focused on creating market awareness and acquiring customers. During this first period, the commercials from both DraftKings and FanDuel focused on educating consumers about the differences from season-long fantasy. Statements-like "So you're into Fantasy Football, then you've gotta (sic) check out these one-week leagues on FanDuel.com,"[158] featured prominently as the companies looked to transition people from season long to DFS. As did statements such as, "You can pick a new team every week and get immediate cash payouts,"[159] which distinguished DFS from season-long fantasy sports.

This period also saw both DraftKings and FanDuel emphasize elements of their games that were similar to sports betting, perhaps to appeal to gamblers. They advertised large prizes ("Check out Chris Prince, he's from Detroit, and he's won over $656,224"),[160] ease of use ("there is no commitment"),[161] qualities associated with gambling ("It's like the best adrenaline rush ever"),[162] and various levels of risk tolerance ("You can find a $1, 5, 10, $25 contest").[163] This first era also introduced consumers to the idea of "immediate" "real cash payouts,"[164] to establish DFS as an easier way to win money compared to other types of betting ("I deposited a total of $35 on FanDuel and won over 2 million").[165]

Not only did FanDuel and DraftKings use gambling categorization to acquire participants, they also hired many of their initial employees directly from the world of state-licensed gambling, and they used gambling to acquire investors and partners.[166] A DraftKings "Market Opportunity Size Data" report explained the "market for DFS is broader than season long fantasy sports alone"

---

[157] Becky Liggero, *Interview with Jason Robins of DraftKings*, CALVIN AYRE (Nov. 26, 2014), https://calvinayre.com/2014/11/26/sports/interview-with-jason-robins-of-draftkings-bl-video/.

[158] FanDuel, *All The Excitement* (first aired 2014), *available at* https://www.ispot.tv/ad/7_rc/fanduel-com-chris-prince.

[159] FanDuel, *All The Excitement* (first aired 2014), *available at* https://www.ispot.tv/ad/7_rc/fanduel-com-chris-prince.

[160] FanDuel, *All The Excitement* (first aired 2014), *available at* https://www.ispot.tv/ad/7_rc/fanduel-com-chris-prince.

[161] FanDuel, *Seventeen Seasons*, (first aired 2015), *available at* https://www.ispot.tv/ad/Ak7s/fanduel-com-one-week-leagues.

[162] FanDuel, *Win Big* (first aired 2015), *available at* https://www.ispot.tv/ad/A7E9/fanduel-one-week-fantasy-football-leagues-win-big.

[163] FanDuel, *Win Big* (first aired 2015), *available at* https://www.ispot.tv/ad/A7E9/fanduel-one-week-fantasy-football-leagues-win-big.

[164] *See e.g.,* FanDuel, *Win Big* (first aired 2015), *available at* https://www.ispot.tv/ad/A7E9/fanduel-one-week-fantasy-football-leagues-win-big.

[165] FanDuel, *Win Big* (first aired 2015), *available at* https://www.ispot.tv/ad/A7E9/fanduel-one-week-fantasy-football-leagues-win-big.

[166] *See e.g.,* Curt Woodward, *DraftKings heading to UK, hires gambling-industry veteran to lead expansion*, BOSTON GLOBE (Aug. 17, 2015), http://www.betaboston.com/news/2015/08/17/draftkings-heading-to-uk-hires-gambling-industry-veteran-to-lead-expansion/.

22

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

and includes "poker" and "sports betting."[167] The report referenced the online betting and casino market, which was expected to grow to $36 billion by 2018, and said "Sport Wagering Vertical is a large addressable market."[168]  Indeed, it seems as though investors frequently drew analogies between DFS and various gambling markets and companies, such as online poker, casinos, lottery sales, and sports betting.[169] For example, a market analysis concluded the market for daily fantasy was "Male Sports Fans, 21-50, Underserved by social and skill game developers, cannot gamble online legally."[170]  Industry insiders supported the gambling categorization. For example, at the Fantasy Sports Trade Association Winter Conference, Adam Krejcik, who is a Principal at Eilers & Krejcik Gaming LCC, a prominent consulting firm, said DFS "[s]erves as a viable alternative for some players who do not have access to sports wagering."[171] He continued, "Increasingly large Guaranteed Prize Pools (GPPs) are also attracting new users & serving as a new alternative for some instant ticket / lottery players,"[172] and "entry fees on Daily Fantasy Sports exceeds the total amount wagered on Sports in all of Nevada by 2016."[173]

During this first period, DraftKings and FanDuel avoided stating outright that they were gambling companies, but they still communicated with various audiences by using associations between DFS, sport betting, and other forms of gaming. These communications strategies helped audiences categorize DFS as a gambling product, which made it easier for DraftKings and FanDuel to attract customers, gain investment, and align with partners' interests.[174]

## C.      During the New York Lawsuit: October 2015 to October 2016

DraftKings and FanDuel's categorization and communication strategies, however, changed during this second period, in which the NYAG attempted to shut down both companies as illegal forms of gambling that purportedly violated New York State law.[175]  At this time, the companies began to change their advertising and communications strategies to differentiate themselves from sport betting. In the process of doing so, they made four main categorizing arguments. First, they associated themselves with traditional full-season fantasy sports leagues, which historically had

---

[167] People by Schneiderman v. DraftKings, 453054/2015, Market Opportunity Size Data NYSCEF Doc No. 20 (filed Nov. 17, 2015).

[168] People by Schneiderman v. DraftKings, 453054/2015, Market Opportunity Size Data NYSCEF Doc No. 20 (filed Nov. 17, 2015).

[169] People by Schneiderman v. DraftKings, 453054/2015, Bain & Company Falcon Interim Update NYSCEF Doc No. 84 (filed Nov. 23, 2015).

[170] People by Schneiderman v. DraftKings, 453054/2015, HubDub NYSCEF Doc No. 18 (filed Nov. 17, 2015).

[171] People by Schneiderman v. DraftKings, 453054/2015, FSTA Winter Conference Adam Krejcik Keynote: Bold Predictions on the Daily Fantasy Sports Market NYSCEF Doc No. 15 (filed Nov. 17, 2015).

[172] People by Schneiderman v. DraftKings, 453054/2015, FSTA Winter Conference Adam Krejcik Keynote: Bold Predictions on the Daily Fantasy Sports Market NYSCEF Doc No. 15 (filed Nov. 17, 2015).

[173] People by Schneiderman v. DraftKings, 453054/2015, FSTA Winter Conference Adam Krejcik Keynote: Bold Predictions on the Daily Fantasy Sports Market NYSCEF Doc No. 15 (filed Nov. 17, 2015).

[174] *See e.g.,* People by Schneiderman v. DraftKings, 453054/2015, Bain & Company Falcon Interim Update NYSCEF Doc No. 84 (filed Nov. 23, 2015).

[175] Associated Press, *DraftKings and FanDuel Declared Illegal in New York State*, INC. (Nov. 10, 2015), https://www.inc.com/associated-press/fanduel-draftkings-illegal-in-new-york-state.html.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

not faced any legal issues in the state of New York.[176] Second, they argued that DFS was a "game of skill" and thus was compliant with the primary operative gambling laws in the state of New York.[177] Third, they argued that their games did not depend on a future contingent event.[178] Fourth, they distinguished their business model from the business model of gambling by arguing that DFS was a social activity.[179]

DraftKings and FanDuel's statements during this period often differed from what they told customers, investors, and partners during the first era.[180] Occasionally, however, FanDuel and DraftKings's arguments about being akin to season long fantasy unraveled in the New York Supreme Court. Minutes from Fantasy Sports Trade Association (FSTA) meetings in 2015 suggest executives from FanDuel and DraftKings were aware of the need to strategically categorize and craft messages to avoid regulation.[181] The FSTA Paid Operation Charter initially required members to be compliant with UIGEA and its so-called "fantasy sports carve out,"[182] but DraftKings had created golf and NASCAR games which were not UIGEA compliant, so the FSTA board discussed whether to change the charter.[183] Robins, the CEO of DraftKings said, "UIGEA has been a good catalyst from a PR/symbolic perspective, but it doesn't apply as administration of law."[184] Robins would further state: "[c]ontinuing to push [the UIGEA carve out] publicly as a safe harbor creates risk."[185] And, the need "to be sounder in our legal arguments for what will hold up in court (e.g., skill)."[186] The FSTA board's discussion of the best way to justify their members' business was to focus communication strategies on emphasizing skill versus chance, and avoid an emphasis on the UIGEA's fantasy language.[187] There were five prominent, observable messages

---

[176] FanDuel, *Real People Real Winnings* (first aired 2015), https://www.ispot.tv/ad/7U9V/draftkings-fantasy-football-real-people-real-winnings.

[177] DraftKings, *The Sleeper* (first aired 2015), https://www.ispot.tv/ad/AVmZ/draftkings-the-sleeper.

[178] *See e.g.,* FanDuel, *Real People Real Winnings* (first aired 2015), https://www.ispot.tv/ad/7U9V/draftkings-fantasy-football-real-people-real-winnings.

[179] *See* DraftKings, *Momentous Moments* (first aired 2016), https://www.ispot.tv/ad/ArPV/draftkings-momentous-moments-featuring-rob-gronkowski.

[180] DraftKings and FanDuel both launched products, leagues mode, and friends mode respectively, that were game options making DFS more closely resemble traditional season long fantasy games typically played amongst friends or associates. *See* Dustin Gouker, *DraftKings Launches 'Leagues' As Daily Fantast Takes More Cues From Season long Version,* LEGAL SPORTS REP. (Aug. 16, 2016), https://www.legalsportsreport.com/11044/draftkings-leagues-launches/.

[181] *See generally,* Dustin Gouker, *How The Fantasy Sports Trade Association Gutted Its Own Self-Regulatory Charter,* LEGAL SPORTS REP. (May 19, 2017), https://www.legalsportsreport.com/8734/fsta-charter-and-dfs-regulation/.

[182] People by Schneiderman v. DraftKings, 453054/2015, FSTA Board of Directors Meeting Minutes NYSCEF Doc No. 85 (filed Nov. 23, 2015).

[183] People by Schneiderman v. DraftKings, 453054/2015, Minutes from Compliance Committee Call NYSCEF Doc No. 86 (filed Nov. 23, 2015). *See also* People by Schneiderman v. DraftKings, 453054/2015, FSTA Board of Directors Meeting Minutes NYSCEF Doc No. 85 (filed Nov. 23, 2015).

[184] People by Schneiderman v. DraftKings, 453054/2015, FSTA Board of Directors Meeting Minutes NYSCEF Doc No. 85 (filed Nov. 23, 2015).

[185] People by Schneiderman v. DraftKings, 453054/2015, FSTA Board of Directors Meeting Minutes NYSCEF Doc No. 85 (filed Nov. 23, 2015).

[186] People by Schneiderman v. DraftKings, 453054/2015, FSTA Board of Directors Meeting Minutes NYSCEF Doc No. 85 (filed Nov. 23, 2015).

[187] People by Schneiderman v. DraftKings, 453054/2015, FSTA Board of Directors Meeting Minutes NYSCEF Doc No. 85 (filed Nov. 23, 2015).

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

that FanDuel and DraftKings used to distinguish their products from prohibited gambling activities that we noted.

The first type of prominent message emphasized the relationship between DFS and traditional season-long fantasy, using statements such as: "DFS is a natural outgrowth of traditional season-long fantasy."[188] Both companies argued there was no relevant legal distinction between DFS and season-long competitions: "The obvious truth is that there is no difference between the two under New York law. It is the same game, differentiated only by the period of time over which each is played."[189] Specifically, DraftKings's drew associations with season-long competitions that charge entry fees and noted that some DFS competitions are free.[190] FanDuel argued,

> In many respects, the short duration of FanDuel's contests allows for a greater exercise of skill, and involves less chance, than contests that play out over a full season, because the participant has more available information (from team and player matchups to injury status and weather) into the factors that may affect the performance of the rostered player in particular games.[191]

By arguing DFS was legally indistinguishable from season-long fantasy, FanDuel also referenced an early statement from the New York Attorney General stating: "the legality of traditional fantasy sports has never been seriously questioned in New York."[192] DraftKings and FanDuel used the NYAG's words as a shield against the allegations of being illegal gambling operators.[193]

In addition, FanDuel and DraftKings began to re-tailor the descriptions of their activities to try to semantically comport with existing gambling laws.[194] Notably, illegal gambling in New York contains three elements: (1) the player "stakes or risks something of value"; (2) the player "receive[s] something of value in the event of a certain outcome" and (3) the player wins or loses depending on "the outcome of a contest of chance or a future contingent event not under [the player's] control or influence."[195] DraftKings and FanDuel focused on the third element of the definition, arguing that DFS is a contest of skill rather than a contest of chance and that it does not depend on a future contingent event. It did so, among other ways, by hiring statisticians and experts

---

[188] People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Gregory B. Karamitis NYSCEF Doc No. 95 (filed Nov. 24, 2015).

[189] People by Schneiderman v. DraftKings, 453054/2015, Reply Brief of Defendant-Appellant DraftKings, Inc.'s Motion For A Stay of Proceedings Pending Appeal NYSCEF Doc No. 117 (filed Jan 26, 2016).

[190] People by Schneiderman v. DraftKings, 453054/2015, Reply Brief of Defendant-Appellant DraftKings, Inc.'s Motion For A Stay of Proceedings Pending Appeal NYSCEF Doc No. 117 (filed Jan 26, 2016).

[191] People by Schneiderman v. DraftKings, 453054/2015, Complaint for Declaratory and Injunctive Relief, FanDuel v. Schneiderman NYSCEF Doc No. 11 (filed Nov. 17, 2015).

[192] People by Schneiderman v. DraftKings, 453054/2015, Complaint for Declaratory and Injunctive Relief, FanDuel v. Schneiderman NYSCEF Doc No. 11 (filed Nov. 17, 2015).

[193] Jonathan Berr, *Fantasy Sports Sites Fire Back at New York AG,* CBS NEWS (Nov. 13, 2015), https://www.cbsnews.com/news/the-legal-brawl-in-new-york-over-fantasy-sports-has-begun/.

[194] N.Y. Pen. Code §225.00 et seq.

[195] N.Y. Pen. Code §225.00 et seq.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

to illustrate the skill-based nature of DFS games.[196] For example, DraftKings's Vice President of Analytics Gregory Karamitis described the results from one study that pitted actual lineups from players against computer-generated simulations as "dramatic and conclusive."[197]

Moreover, both companies attempted to explain that because a minority of players win with greater frequency, the games are skill-based. DraftKings stated: "DFS is a game of skill that rewards experience, talent, and improvement over time."[198] Further, both companies described in detail the skill sets, research, analytics, knowledge, and creative thinking that goes into picking a lineup.[199] They also explained how game design elements, such as salary caps, made the game more skilled.[200] Finally, they explained how DFS is similar to legal activities like investing and different from illegal activities, such as poker – a big move from DraftKings's earlier strategy of drawing upon the poker comparison.[201]

DraftKings and FanDuel further contended that DFS players are the contestants in their own event, separate from the underlying sport competition.[202] As DFS players compete on their own, the future contingent event is the *fantasy teams' performances*, not the real players' performances on the field. FanDuel and DraftKings argued this makes DFS by definition distinct from gambling, it is a competition between two contestants.[203] DraftKings stated:

> The outcomes of daily fantasy sports contests do not depend on any one real-world team's winning or any real life athletes' surpassing particular benchmarks of performance (such as throwing a touchdown or hitting a homerun) or even upon any one real-life athlete's performance.… Instead, daily fantasy sports competitions are decided based on the relative strength of the composite statistics generated by the lineups selected by the fantasy contestants—which bear no relation to any real-world sports team. …. In short,

---

[196] *See e.g.,* People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Dr. Abraham J. Wyner, FanDuel v. Schneiderman NYSCEF Doc No. 97 (filed Nov. 24, 2015).

[197] People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Gregory B. Karamitis NYSCEF Doc No. 95 (filed Nov. 24, 2015).

[198] People by Schneiderman v. DraftKings, 453054/2015, Complaint for Declaratory and Injunctive Relief, DraftKings, Inc. v. Schneiderman NYSCEF Doc No. 10 (filed Nov. 17, 2015).

[199] *See e.g.,* People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Gregory B. Karamitis NYSCEF Doc No. 95 (filed Nov. 24, 2015).

[200] People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Gregory B. Karamitis NYSCEF Doc No. 95 (filed Nov. 24, 2015).

[201] *See* John T. Holden & Ryan M. Rodenberg, *Modern Day Bucket Shops? Fantasy Sports and Illegal Exchanges*, 6 TEX. A&M L. REV. 202 (2019).

[202] Jay Caspian Kang, *How The Daily Fantasy Sports Industry Turns Fans Into Suckers*, N.Y. TIMES (Jan. 6, 2016), https://www.nytimes.com/2016/01/06/magazine/how-the-daily-fantasy-sports-industry-turns-fans-into-suckers.html.

[203] *See* Nick Statt, *New York Attorney General is Waging War Against DraftKings and FanDuel*, THE VERGE (Nov. 17, 2015), https://www.theverge.com/2015/11/17/9751266/draftkings-fanduel-ny-attorney-general-daily-fantasy-sports.

26

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

the "future contingent event" upon which the outcome of daily fantasy sports competitions depend is the competition between two or more fantasy teams.[204]

To support their argument, they compared fantasy players to the racehorse owners.[205]

DraftKings and FanDuel further argued that they create platforms with the express purpose of detaching the fantasy game from the real game.[206] They also claimed fantasy players control the outcome of the contest. For example, "[the fantasy players] are actually the movers, the marionettiers of that outcome, and the fact that they aren't participating in the underlying sporting event doesn't alter their role as very active participants in this separate contest."[207]

Finally, DraftKings and FanDuel distanced themselves from the business model of gambling. They used careful language, such as "fees" rather than "bets" or "wagers."[208] They argued the prize structure is set and known in advance and that, as a result, they could lose money on certain games if too few players entered.[209] FanDuel explained why it is not like a "house" or a "bookie,"[210] and DraftKings explained why they were not taking a "rake," instead they charge a "fee."[211]

DraftKings and FanDuel also distanced themselves from gambling by showing how their games are different from prop bets, parlays, and lotteries.[212] In order to draw a distinction from illegal activities FanDuel and DraftKings associated with legal activities, FanDuel argued: "As investors make selections for their portfolios, FanDuel participants base their DFS player selections on historical performance, statistics, research and trends."[213] DraftKings and FanDuel supported all of these arguments with the repeated framing of DFS as an "enormously popular"

---

[204] People by Schneiderman v. DraftKings, 453054/2015, Reply Brief of Defendant-Appellant DraftKings, Inc.'s Motion For A Stay of Proceedings Pending Appeal NYSCEF Doc No. 117 (filed Jan 26, 2016) (internal citations omitted).

[205] People by Schneiderman v. DraftKings, 453054/2015, Reply Brief of Defendant-Appellant DraftKings, Inc.'s Motion For A Stay of Proceedings Pending Appeal NYSCEF Doc No. 117 (filed Jan 26, 2016) (internal citations omitted).

[206] *See* People by Schneiderman v. DraftKings, 453054/2015, Transcript *People of the State of New York v. DraftKings, Inc.*, Nov. 25, 2015 NYSCEF Doc No. 106 (filed Nov. 30, 2015).

[207] People by Schneiderman v. DraftKings, 453054/2015, Transcript *People of the State of New York v. DraftKings, Inc.*, Nov. 25, 2015 NYSCEF Doc No. 106 (filed Nov. 30, 2015).

[208] People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Jason Robins NYSCEF Doc No. 94 (filed Nov. 24, 2015).

[209] People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Jason Robins NYSCEF Doc No. 94 (filed Nov. 24, 2015).

[210] People by Schneiderman v. FanDuel, 453056/2015, Memorandum of FanDuel, Inc. In Opposition To Plaintiff's Motion For A Preliminary Injunction NYSCEF Doc No. 105 (filed Nov. 23, 2015).

[211] People by Schneiderman v. DraftKings, 453054/2015, Reply Brief of Defendant-Appellant DraftKings, Inc.'s Motion For A Stay of Proceedings Pending Appeal NYSCEF Doc No. 117 (filed Jan 26, 2016).

[212] People by Schneiderman v. DraftKings, 453054/2015, Complaint for Declaratory and Injunctive Relief, FanDuel v. Schneiderman NYSCEF Doc No. 11 (filed Nov. 17, 2015).

[213] People by Schneiderman v. DraftKings, 453054/2015, Complaint for Declaratory and Injunctive Relief, FanDuel v. Schneiderman NYSCEF Doc No. 11 (filed Nov. 17, 2015).

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

"beloved industry" and "national pastime" "ingrained in American culture."[214] Finally, DraftKings and FanDuel argued that fantasy players aim to play against friends and family, which suggests players use DFS mainly to socialize.[215]

During this period, DraftKings and FanDuel's advertising also began to emphasize the social aspects of the contests, perhaps intentionally drawing an association to season-long fantasy games, traditionally, played among groups of friends.[216] Both companies took the opportunity to launch new special social products around the period of the NYAG cases.[217] FanDuel's "Friends Mode,"[218] and DraftKings's private league mode were part of a new advertising campaign stating: "Create a private league and play against your friends."[219] Advertisements also explained how playing DFS enhanced sports spectating. FanDuel's *Win Any Weekend* commercial states: "Every second of every game matters like never before,"[220] and DraftKings's *Week One* advertisement notes, "What are you waiting for? You like football, you like winning, why don't you like both at the same time."[221] DraftKings and FanDuel made small adjustments to their advertising strategy to lessen direct associations with gambling and add emphasis on aspects similar to season-long fantasy. It is likely these adjustments were a response to the NYAG's action against the two companies.

**D.      Immediate Aftermath of the New York Lawsuit: October 2016 to July 2017**

Directly following the 2016 settlements with the New York Attorney General, DraftKings and FanDuel were largely absent from the media. Both companies were reportedly short on capital, and fearful of becoming targets of further legal challenge.[222] In addition, it is not surprising that both companies refrained from spending marketing dollars as they moved toward controlling a duopoly market. Indeed, once the legal challenges to daily fantasy sports spooked away Yahoo!'s

---

[214] *See e.g.,* People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Jason Robins NYSCEF Doc No. 94 (filed Nov. 24, 2015).

[215] People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Jason Robins NYSCEF Doc No. 94 (filed Nov. 24, 2015).

[216] Dustin Gouker, *DraftKings Launches 'Leagues' As Daily Fantast Takes More Cues From Season long Version*, LEGAL SPORTS REP. (Aug. 16, 2016), https://www.legalsportsreport.com/11044/draftkings-leagues-launches/.

[217] Dustin Gouker, *DraftKings Launches 'Leagues' As Daily Fantast Takes More Cues From Season long Version*, LEGAL SPORTS REP. (Aug. 16, 2016), https://www.legalsportsreport.com/11044/draftkings-leagues-launches/.

[218] Dustin Gouker, *DraftKings Launches 'Leagues' As Daily Fantast Takes More Cues From Season long Version*, LEGAL SPORTS REP. (Aug. 16, 2016), https://www.legalsportsreport.com/11044/draftkings-leagues-launches/.

[219] DraftKings, *Momentous Moments* (first aired 2016), https://www.ispot.tv/ad/ArPV/draftkings-momentous-moments-featuring-rob-gronkowski.

[220] FanDuel, *Win Any Weekend* (first aired 2015), https://www.ispot.tv/ad/AVRx/fanduel-com-fantasy-football-win-any-weekend.

[221] DraftKings, *Week One* (first aired 2015), https://www.ispot.tv/ad/AVRx/fanduel-com-fantasy-football-win-any-weekend.

[222] Emmett Knowlton, *One year after taking over the fantasy football world, DraftKings and FanDuel are reportedly running out of cash and can't pay their vendors*, BUS. INSIDER (Oct. 24, 2016), https://www.businessinsider.com/draftkings-and-fanduel-reportedly-running-out-of-cash-and-cant-make-payments-2016-10.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

attempt to become the third deep-pocketed company in the DFS marketplace, it was easy for the two big remaining players to adopt a consciously parallel strategy of non-advertisement.[223]

At the same time, DraftKings and FanDuel entered into merger talks with one another. Believing that they would ultimately be allowed to merge into a single company, luring new customers to one company over the other provided little economic value.[224] Nevertheless, DraftKings and FanDuel's purported belief that the Federal Trade Commission would allow them to merge proved incorrect.[225] As some experts in antitrust law had rightfully predicted, the Federal Trade Commission, acting jointly with the Offices of the Attorneys General in the State of California and the District of Columbia, ultimately "authorized legal action to block the merger" to prevent the creation of a combined company that, "would control more than 90 percent of the U.S. market for paid daily fantasy sports contests."[226] While the FTC's decision to challenge the proposed FanDuel-DraftKings merger was obvious to most neutral outsiders, it may have especially caught these DFS companies off guard based on their past ability to surmount high legal hurdles simply through reclassification and lobbying.[227]

## E.     Prior to Supreme Court decision on PASPA: August 2017 to May 2018

When DraftKings and FanDuel returned to advertising after a post-settlement hiatus, they also returned to their earlier advertising strategy of emphasizing the gambling-like aspects of their games.[228] While the social aspects continued to receive some emphasis, both companies highlighted contests facially non-compliant with the UIGEA exemption for fantasy sports, including advertising contests on single-day golf tournaments.[229]

---

[223] *See generally* Dustin Gouker, *Mayer, Yahoo "Can and Should Compete in Daily Fantasy Sports, Will Launch "This Summer,"* Legal Sports Report, Jul. 15, 2015, https://www.legalsportsreport.com/1112/yahoo-will-enter-daily-fantasy-sports-industrty (describing Yahoo's launch of its daily fantasy sports product); Dustin Gouker, *New York Daily Fantasy Sports Developments: Yahoo Out; DFS Not Likely in State Budget?* Legal Sports Report, Mar. 22, 2016 (discussing Yahoo!'s leaving of certain markets as the New York daily fantasy sports litigations progress).

[224] Marc Edelman, *Why Antitrust Regulators Could Block a DraftKings Merger with FanDuel*, FORBES (Oct. 29, 2016), https://www.forbes.com/sites/marcedelman/2016/10/29/why-antitrust-regulators-could-block-a-draftkings-merger-with-fanduel/#662e8ede2e1a.

[225] Marc Edelman, *Why Antitrust Regulators Could Block a DraftKings Merger with FanDuel*, FORBES (Oct. 29, 2016), https://www.forbes.com/sites/marcedelman/2016/10/29/why-antitrust-regulators-could-block-a-draftkings-merger-with-fanduel/#662e8ede2e1a.

[226] FTC Press Release (June 19, 2017), https://www.ftc.gov/news-events/press-releases/2017/06/ftc-two-state-attorneys-general-challenge-proposed-merger-two.

[227] *See, e.g.,* Marc Edelman, *Why Antitrust Regulators Could Block a DraftKings Merger with FanDuel*, FORBES (Oct. 29, 2016), https://www.forbes.com/sites/marcedelman/2016/10/29/why-antitrust-regulators-could-block-a-draftkings-merger-with-fanduel/#662e8ede2e1a (an article in which one of this article's three authors, Marc Edelman, who had previously practiced antitrust law at Skadden, Arps, correctly predicted the Federal Trade Commission would block the DraftKings-FanDuel merger).

[228] It was reported that the companies had nearly exhausted their capital and were struggling to find means to stay afloat. *See* Emmett Knowlton, *One year after taking over the fantasy football world, DraftKings and FanDuel are reportedly running out of cash and can't pay their vendors*, BUS. INSIDER (Oct. 24, 2016), https://www.businessinsider.com/draftkings-and-fanduel-reportedly-running-out-of-cash-and-cant-make-payments-2016-10.

[229] *See e.g.,* FanDuel, *Inside Scream* (first aired 2017), https://www.ispot.tv/ad/wZ1g/fanduel-golf-inside-scream.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 *American Business Law Journal* ___ (2020).

While commercials featured promotional codes in all five examined eras, the companies' promotional offers appeared more generous and prominent during the fourth era than during the second or third eras.[230] Promotions also appeared throughout the commercials, rather than only appearing at the end.[231] Attention also focused on the simplicity of DFS contests, suggesting a similarity to sports betting. For example, in a television commercial for their UIGEA-noncompliant NASCAR game, DraftKings explained that "fantasy NASCAR is easy to play; simply draft six drivers, while staying within the $50000 salary, drivers score points for laps led, fastest lap and finishing position."[232]

These advertisements appeared to focus increasingly on consumer acquisition and the company's UIGEA non-compliant contests, including, most astoundingly, "daily fantasy football" contests based on single National Football League games.[233] Through a review of this marketing and advertising approach, it seems DraftKings (and, to a slightly lesser extent, FanDuel) sought to acquire as many customers as possible, even though they were in danger of either states like Illinois or the federal government bringing an action against them.[234] It may be that the companies predicted the Supreme Court would overturn PASPA and were trying to position themselves to dominate a newly legal sports betting market. Alternatively, their financial situation was such that the companies calculated the risks of offering facially illegal contests against the benefit of survival and decided to proceed with their legally risky activities.[235]

## F.    After *Murphy*: May 2018 to 2019

After the Supreme Court overturned PASPA, a number of states moved quickly to legalize sports wagering.[236] New Jersey was amongst the first to implement regulations to allow for online companies, in partnership with preexisting casinos, to offer online sports betting within the state's borders.[237] DraftKings and FanDuel immediately sought to embrace this label

---

[230] *See e.g.,* DraftKings, *NASCAR Fantasy Contest* (first aired 2018), https://www.ispot.tv/ad/wmwN/draftkings-nascar-fantasy-contest.

[231] DraftKings, *NASCAR Fantasy Contest* (first aired 2018), https://www.ispot.tv/ad/wmwN/draftkings-nascar-fantasy-contest; *C.f.,* DraftKings, *The Sleeper* (first aired 2015), https://www.ispot.tv/ad/AVmZ/draftkings-the-sleeper.

[232] DraftKings, *NASCAR Fantasy Contest* (first aired 2018), https://www.ispot.tv/ad/wmwN/draftkings-nascar-fantasy-contest.

[233] Eric Ramsey, *DraftKings Offering Single-Game Fantasy Contests For First Time During NFL Playoffs*, LEGAL SPORTS REP. (Jan. 3, 2019), https://www.legalsportsreport.com/17292/draftkings-showdown-nfl-playoffs-fantasy/.

[234] *See* Adam White, *DraftKings Leverages Custom Games to Drive Revenue and Acquisition,* FRONT OFFICE SPORTS (Dec. 19, 2018), https://frntofficesport.com/draftkings-revenue-acquisition/.

[235] Emmett Knowlton, *One year after taking over the fantasy football world, DraftKings and FanDuel are reportedly running out of cash and can't pay their vendors,* BUS. INSIDER (Oct. 24, 2016), https://www.businessinsider.com/draftkings-and-fanduel-reportedly-running-out-of-cash-and-cant-make-payments-2016-10.

[236] *See* Marc Edelman, *Regulating Sports Gambling in the Aftermath of Murphy v. National Collegiate Athletic Association*, 26 Geo. Mason L. Rev. ___ (Forthcoming), *available at:* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3285361.

[237] Nick Corasaniti, *Game On! Legislature Approves Sports Betting in New Jersey,* N.Y. TIMES (June 7, 2018), https://www.nytimes.com/2018/06/07/nyregion/sports-betting-new-jersey.html.

30

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

of sports betting and sought a casino partner.[238] In addition, both companies, nearly immediately, launched commercials for their new sports betting apps. DraftKings's *Good News, Bad News* commercial introduced "DraftKings new sportsbook app," which allows the player to "bet on any games you want, anytime you want."[239] Along the bottom of the screen, a promotion claims "first bet matched instantly up to $500."[240] Each company also sought to distinguish itself from its competitors by highlighting its betting app's features.[241]

DraftKings and FanDuel's entrance into the newly-legal New Jersey sports betting market was a huge success.[242] FanDuel launched a sportsbook at the Meadowlands, right across the bridge from New York, taking in $1.372 million in its first month, accounting for more than 35 percent of the total revenue generated by New Jersey's legal sports betting.[243] DraftKings and FanDuel matched established betting companies, and even outperformed many companies that spent years operating legal sports-betting in Nevada and overseas.[244] In February of 2019–a month in which brick and mortar sportsbooks in New Jersey saw an overall loss of more than $118,000–FanDuel and DraftKings combined to generate more than $10 million in revenue, accounting for more than 80 percent of the mobile sports betting revenue in the state.[245] In just over a year, FanDuel and DraftKings effectively displaced longstanding bookmakers in the New Jersey market.[246] The momentum in New Jersey pushed FanDuel and DraftKings into other markets that sought to similarly legalize and regulate sports betting, such as Mississippi.[247] Since then, the two former DFS market-makers appear to be continuing to build customer rolls via DFS while simultaneously seeking to receive "sports gambling" licenses in the states that follow New Jersey's lead in legalizing traditional sports gambling.[248]

---

[238] Eric Ramsey, *The Week In Sports Betting: FanDuel And DraftKings Making All The Moves*, LEGAL SPORTS REP. (July 20, 2018), https://www.legalsportsreport.com/22178/the-week-in-sports-betting-news-july-20/.

[239] DraftKings, *Good News Bad News* (first aired 2018), https://www.ispot.tv/ad/dS65/draftkings-sportsbook-good-news-bad-news-feat-charles-barkley.

[240] DraftKings, *Good News Bad News* (first aired 2018), https://www.ispot.tv/ad/dS65/draftkings-sportsbook-good-news-bad-news-feat-charles-barkley.

[241] DraftKings, *Good News Bad News* (first aired 2018), https://www.ispot.tv/ad/dS65/draftkings-sportsbook-good-news-bad-news-feat-charles-barkley. *See also* FanDuel, *More is More* (first aired 2018), https://www.ispot.tv/ad/d87v/fanduel-sportsbook-more-is-more.

[242] Bill Gelman, *New Jersey Sports Betting Has Huge Impact On Total Legal US Handle*, NJ GAMBLING SITES (Mar. 6, 2019), https://www.njgamblingsites.com/20198/sports-betting-nj-handle-compare/.

[243] Play NJ, *New Jersey Sports Betting Revenue*, https://www.playnj.com/sports-betting/revenue/ (last updated Mar. 15, 2019).

[244] Play NJ, *New Jersey Sports Betting Revenue*, https://www.playnj.com/sports-betting/revenue/ (last updated Mar. 15, 2019).

[245] Play NJ, *New Jersey Sports Betting Revenue*, https://www.playnj.com/sports-betting/revenue/ (last updated Mar. 15, 2019).

[246] Play NJ, *New Jersey Sports Betting Revenue*, https://www.playnj.com/sports-betting/revenue/ (last updated Mar. 15, 2019).

[247] *See* Dustin Gouker, *DraftKings' First Land-Based Sportsbook is Coming This Week To Mississippi*, LEGAL SPORTS REP. (Nov. 12, 2018), https://www.legalsportsreport.com/25836/draftkings-sportsbook-coming-mississippi/.

[248] *See* Mary Perez, *FanDuel CEO knows why sports betting is different in Mississippi as company brands 2 locations*, SUN HERALD (Sep. 12, 2018), https://www.sunherald.com/news/business/casino-gambling/article218181855.html.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ____ (2020).

## IV. Implications

This discussion section addresses three principal types of implications. In Part A we discuss the direct implications of this examination. Importantly, we observe that the calculations made by FanDuel and DraftKings to portray themselves differently to different audiences at different times allowed for their survival. In Part B we discuss the business implications that can be derived from this study. Finally, in Part C we discuss the legal implications, and strategies that law makers can employ to limit firms' ability to arbitrage regulations, thereby avoiding the intent of the law.

## A.    Direct Implications

The foregoing illustration of DraftKings and FanDuel's changing way of describing their businesses in the context of different legal structures and cultural perceptions highlights how DraftKings and FanDuel used a fluid categorization strategy. A fluid categorization strategy means they categorized themselves differently, to different audiences, at different times.[249] DraftKings and FanDuel leveraged these audience inconsistences by presenting different categorization messages, so that it was possible for consumers and investors to think DFS was like gambling,[250] whereas many regulators struggled to ban DFS despite its similarities to sports betting.[251] Although DraftKings and FanDuel certainly looked like gambling, they made their category membership uncertain for long enough to avoid full regulation and to enter and dominate the newly legal sports betting market after the *Murphy* decision.[252] Surviving until the *Murphy* decision enabled FanDuel and DraftKings to utilize a similar underlying product with already existing and substantial customer lists. They had an advantage over competitors because consumers were familiar with their brands and were familiar with their platforms and technology.

While DraftKings and FanDuel ultimately proved successful in New York and elsewhere, their success is foremost attributable to successful lobbying.[253] Indeed, things could have gone very differently for those two companies if they had not been able to hire a lobbyist to change the laws in various states and deter attorneys general intervention in others. For example, in New York, the attorney general's legal challenge against both companies would have proceeded forward had Governor Andrew Cuomo not signed into law a bill on August 3, 2016 that excluded daily fantasy sports from the legal definition of gambling.[254] If not for this legal change, DraftKings, as well as its high-level officers, may have ultimately found themselves in violation

---

[249] We define fluid categorization is an arbitrage supporting strategy that leverages audience inconsistencies.

[250] *See* Shane M. Murphy, *Sport Psychology and the Problem Fantasy Sports Gambling*, SOC'Y FOR SPORT EXERCISE & PERFORMANCE PSYCH. (Dec. 2015), *available at* https://www.apadivisions.org/division-47/publications/newsletters/exercise-sport/2015/12/fantasy-sports-gambling.

[251] John T. Holden & Simon A. Brandon-Lai, *Advertised Incentives for Participation in Daily Fantasy Sports Contests in 2015 and 2016: Legal Classifications and Consumer Implications*, 15 ENT. & SPORTS L.J. 1 (2017).

[252] *See* Zack Guzman, *Ahead of NFL Draft FanDuel CEO says Sports Betting Will Never Be Legalized Across the Country*, YAHOO (Apr. 25, 2019), https://finance.yahoo.com/news/ahead-of-nfl-draft-fan-duel-ceo-says-sports-betting-will-never-be-legalized-across-the-country-214902546.html.

[253] For an overview of some of DraftKings and FanDuel's recent lobbying expenditures, *see* Nicholaus Garcia, *DraftKings, FanDuel Spent $1 Million On Campaign Contributions As Sports Betting Expands*, PLAY USA (Apr. 12, 2019), https://www.playusa.com/draftkings-and-fanduel-spend-on-sports-betting/.

[254] *See* Nick Niedzwiadek, *Cuomo Signs Daily Fantasy Sports Bill*, POLITICO (Aug. 3, 2016), https://www.politico.com/states/new-york/albany/story/2016/08/cuomo-signs-daily-fantasy-sports-bill-104490.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

of criminal law if they continued to operate in the state.[255] In addition, in states like Illinois and Texas, matters could have gone even worse, as both states issued attorneys general opinions advising daily fantasy sports companies that the state viewed their businesses as violating state gambling law.[256] Yet, even despite these attorneys general opinions, DraftKings and FanDuel continued operating in these states and never faced legitimate effort to stop them.

As a matter of legal commentary, it seems both hugely unfair and antithetical to public policy for state attorneys general to issues advisory opinions about the illegality of daily fantasy sports that scares away law-abiding businesses but not thereafter filing criminal lawsuits against those companies who choose to remain in the marketplace. It may seem even more abhorrent that in the State of New York the gaming authority has grandfathered companies that were offering DFS contests in the state on the date it brought its legal challenge against DraftKings and FanDuel but still to this day has refused to license any new company that properly waited for legal clearance before entering the market.[257] Nevertheless, DraftKings and FanDuel managed to play this legal game of "chicken" with state attorneys general incredibly successfully, albeit many would find the rewarding of their being unaware, if not downright indifferent, to state legal risks to be rather disconcerting.

DraftKings and FanDuel did not trick regulators, but they raised enough uncertainty that regulators did not enforce gambling statutes when they could have. The companies' four main categorizing arguments -- (1) DFS is the same as traditional season-long fantasy,[258] (2) DFS is a game of skill,[259] (3) competitions do not depend on a future contingent event outside of the player's control,[260]and (4) DFS businesses are not gambling businesses[261]-- raised enough uncertainty about the nature of DFS and the applicability of gambling statutes that regulators avoided enforcement. DraftKings and FanDuel were particularly insistent that their services were "games of skill."[262] Both FanDuel and DraftKings received legal opinions noting player control and skill

---

[255] Nick Niedzwiadek, *Cuomo Signs Daily Fantasy Sports Bill*, POLITICO (Aug. 3, 2016), https://www.politico.com/states/new-york/albany/story/2016/08/cuomo-signs-daily-fantasy-sports-bill-104490.

[256] *See* Associated Press, *DraftKings and FanDuel Probably Illegal in Texas, State's Attorney General Says*, THE GUARDIAN (Jan 20, 2016), https://www.theguardian.com/sport/2016/jan/20/draftkings-fanduel-illegal-texas.

[257] *See* Marc Edelman, New York Fantasy Sports Law Keeps Out Earnest Competition, Rewards Gun Jumpers, Forbes, May 31, 2018, https://www.forbes.com/sites/marcedelman/2018/05/31/new-yorks-fantasy-sports-law-keeps-out-earnest-competition/#332dcc6d67a7.

[258] People by Schneiderman v. DraftKings, 453054/2015, Reply Brief of Defendant-Appellant DraftKings, Inc.'s Motion For A Stay of Proceedings Pending Appeal NYSCEF Doc No. 117 (filed Jan 26, 2016).

[259] People by Schneiderman v. DraftKings, 453054/2015, Affidavit of Gregory B. Karamitis NYSCEF Doc No. 95 (filed Nov. 24, 2015).

[260] People by Schneiderman v. DraftKings, 453054/2015, Reply Brief of Defendant-Appellant DraftKings, Inc.'s Motion For A Stay of Proceedings Pending Appeal NYSCEF Doc No. 117 (filed Jan 26, 2016) (internal citations omitted).

[261] People by Schneiderman v. FanDuel, 453056/2015, Brief for Defendant-Appellant NYSCEF Doc No. 139 (filed Feb. 24, 2016).

[262] People by Schneiderman v. FanDuel, 453056/2015, Brief for Defendant-Appellant NYSCEF Doc No. 139 (filed Feb. 24, 2016).

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ____ (2020).

were the most important criteria for most State laws on gambling.[263] The Fantasy Sports Trade Association (now the Fantasy Sports & Gaming Association) also created confusion over the role of skill in the determination of an activity as gambling, stating: "Fantasy sports is not gambling—it's a game of skill."[264] The organization further advanced the myth that UIGEA was a broad exemption for fantasy sports,[265] while neglecting UIGEA's rule of construction that the statute does not modify any existing federal or state law.[266] As a result, regulators were led to question their interpretations of DFS and the application of relevant gambling statutes and failed to act.[267]

Non-enforcement of gambling statutes is something that caught the eye of many, including Jon Bruning, the former Attorney General of Nebraska, who noted in testimony before Congress that new anti-gambling laws are of little importance if they continue to be enforced infrequently.[268] Indeed, had regulators sought to try DFS companies under any of the statutes pertaining to sports betting, such as the UIGEA,[269] the Illegal Gambling Businesses Act,[270] PASPA,[271] or the Wire Act,[272] DraftKings and FanDuel would have faced substantial risk and costs that would have

---

[263] People by Schneiderman v. DraftKings, 453054/2015, Letter to DraftKings, Inc. from Anthony Cabot Re: Legality of Offering Fantasy Sports Based Skill-Gaming In The United States NYSCEF Doc No. 89 (filed Nov. 23, 2015); *see also* People by Schneiderman v. DraftKings, 453054/2015, Letter to Nigel Eccles from Marc Zwillinger & Jacob A. Sommer Re: Legality of FanDuel's Daily Fantasy Contests Under United States Law NYSCEF Doc No. 90 (filed Nov. 23, 2015).

[267] DraftKings and FanDuel's strategy can be described as gaslighting, which refers "to a specific type of manipulation where the manipulator is trying to get someone else (or a group of people) to question their own reality, memory or perceptions." Sarah DiGiulio, *What is gaslighting? And how do you know if it's happening to you?*, NBC NEWS (July 13, 2018), https://www.nbcnews.com/better/health/what-gaslighting-how-do-you-know-if-it-s-happening-ncna890866.

[268] Written Testimony of Jon C. Bruning before the Crime, Terrorism and Homeland Security and Investigations Subcommittee of the House Judiciary Committee "Post-PASPA: An Examination of Sports Betting in America." (Sep. 27, 2018), *available at* https://docs.house.gov/meetings/JU/JU08/20180927/108721/HHRG-115-JU08-Wstate-BruningJ-20180927.pdf.

[269] In addition, Jason Robins reported acknowledgement that NASCAR contests are not within the letter of UIGEA's exemption for certain fantasy sports, nor are certain daily fantasy golf tournaments, which DraftKings offered, and FanDuel has subsequently begun offering. *See* Zack Hall, *While Daily Fantasy Golf Keeps Growing At DraftKings And Beyond, Legal Questions Linger*, LEGAL SPORTS REP. (July 13, 2015), https://www.legalsportsreport.com/2282/daily-fantasy-golf-legality/.

[270] The Illegal Gambling Business Act prohibits gambling businesses that operate in violation of state law, with five or more people, and are in substantially continuous operation for more than thirty days or have gross revenue in excess of $2,000 in a single day. The exceptionally broad statute effectively federalizes most violations of state gambling laws. In the case of DraftKings or FanDuel, either company would likely satisfy the material elements of the statute by accepting any money from customers in Illinois, Florida, or Texas (prior to a settlement being reached), as well as any other state that found DFS to violate state gaming laws. *See* 18 U.S.C. § 1955 (2014).

[271] Prior to its demise at the Supreme Court, there was an argument that state legalization of DFS may violate PASPA. *See* Will Green, *PASPA's Problem With Selective Enforcement For US Sports Betting Could Be Larger Than First Thought*, LEGAL SPORTS REP. (Nov. 23, 2016), https://www.legalsportsreport.com/12196/paspa-sports-betting-selective-enforcement/.

[272] The Wire Act prohibits the interstate transmission of information assisting in the placing of bets or wagers on a sporting event or contest where such activity is not legal in both jurisdictions, by virtue of this prohibition, any state finding that FanDuel or DraftKings activities constituted bets or wagers, would seemingly mean that a company operating within the state from another jurisdiction would be in violation of the Wire Act. *See* 18 U.S.C. § 1084 (2014). Additionally, the UIGEA exemption only exempts enumerated activities as not bets and wagers, leaving the possibility that FanDuel and DraftKings' NASCAR and Golf events violated the Wire Act. *See* 31 U.S.C. § 5362 (2006).

34

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

hindered their ability to thrive. Despite rumored federal grand jury hearings,[273] and the FTC blocking the proposed merger between the two companies, there appeared to be little effort to enforce federal gaming prohibitions against the DFS companies.[274] There was a largely similar response on the state-level, despite declarations from numerous attorney generals that DFS contests violated state gambling laws.

FanDuel and DraftKings continued to operate in many states with little consequence. While FanDuel and DraftKings ceased operating in some states such as Hawaii following the issuing of an opinion finding that DFS contests are contests of chance, in violation of Hawaii's anti-gambling laws,[275] the companies remained active following negative opinions in states like Illinois.[276] Even in states where the risk appeared to be greater, given overtures from state law enforcement agencies, like Texas, DraftKings continued to operate, and while FanDuel initially reached a settlement with the state and left voluntarily,[277] they re-entered the market in 2018, despite a negative opinion from the state's Attorney General Ken Paxton.[278] The calculus that both DraftKings and FanDuel made to persist in hostile markets was instrumental in outlasting their more risk averse competition who were unable to sustain sufficient capitalization to compete with well-funded companies like DraftKings and FanDuel.[279]

## B.    Business Implications

As unseemly as they may have been, the risks taken by DraftKings and FanDuel paid off, as both companies emerged as the leaders in the newly legal sports betting market.[280] Like companies in other industries that have taken similar risks such as  Airbnb, Uber and Lyft, both DraftKings and FanDuel are therefore reasonable examples of disrupters who have succeeded

---

[273] Darren Heitner, *DraftKings And FanDuel Are Playing With Fire In Florida*, FORBES (Feb. 22, 2016), https://www.forbes.com/sites/darrenheitner/2016/02/22/draftkings-and-fanduel-are-playing-with-fire-in-florida/#2a51279239d0.

[274] Darren Heitner, *To Prevent Fantasy Monopoly, FTC Blocks DraftKings-FanDuel Merger*, FORBES (June 19, 2017), https://www.forbes.com/sites/darrenheitner/2017/06/19/ftc-files-complaints-to-block-fanduel-draftkings-merger/#536407ec2adc.

[275] Haw. AG-Op No. 16-1 (Jan. 27, 2016), *available at* http://ag.hawaii.gov/wp-content/uploads/2016/01/News-Release-2016-2.pdf.

[276] Ill. AG-Op No. 15-006 (Dec. 23, 2015), *available at* https://www.legalsportsreport.com/wp-content/uploads/2015/12/Illinois-DFS.pdf.

[277] Eric Ramsey, *Texas to FanDuel: 'State Does Not Agree That You May Engage in Fantasy Sports Gambling*, PLAY USA (Sep. 11, 2018), https://www.playusa.com/fanduel-draftkings-texas-fantasy-sports-lawsuit/.

[278] Texas AG-Op No. KP-0057 (Jan. 19, 2016), *available at* https://www.legalsportsreport.com/wp-content/uploads/2016/01/Texas-ag-dfs-decision.pdf.

[279] While a few sites other than DraftKings and FanDuel survived, notably Yahoo and Draft, others like FantasyHub, Fantasy Aces, and DraftOps, who spent tens of millions of dollars attempting the compete with the DFS giants, eventually went out of business. *See* Dustin Gouker, *Why Did So Many Daily Fantasy Sports Startups Fall By The Wayside? It Wasn't Just Bad Timing And Bad Luck*, LEGAL SPORTS REP. (Apr. 18, 2017), https://www.legalsportsreport.com/13758/daily-fantasy-sports-contraction/.

[280] Darren Heitner, *Former Investment Darlings DraftKings And FanDuel Are Struggling To Grow*, FORBES (Feb. 14, 2018), https://www.forbes.com/sites/darrenheitner/2018/02/14/former-investment-darlings-draftkings-and-fanduel-are-struggling-to-grow/#60aa0712269e.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

based on their willingness to disregard (or at least adopt a liberal interpretation) of existing law.[281] Therefore, analysis of the DFS industry may provide broader lessons for businesses conducting regulatory arbitrage in a number of different ways.

First, this case outlines the merits and drawbacks of a fluid categorization strategy. DraftKings and FanDuel used gambling associations to acquire gambling customers.[282] They used gambling market comparisons to gain investors.[283] However, when challenged by the NYAG, DraftKings and FanDuel distanced themselves from gambling and sports betting, which may have helped them reach a settlement to avoid the NYAG continuing to pursue the case.[284] DraftKings and FanDuel were able to use a fluid strategy to benefit from being categorized with gambling by some audiences, while avoiding regulatory costs of being categorized as gambling by regulators and other audiences by raising sufficient doubt about the actual status of the games.

Fluid categorization, however, also had costs. DraftKings and FanDuel each paid $6 million to settle with the state of New York.[285] With substantial legal bills incurred during the NYAG case and lobbying around the country, the costs nearly caused both companies to go bankrupt.[286] Thus, fluid categorization should not be seen as a strategy for avoiding costs entirely, but a way of minimizing regulatory costs. Moreover, DraftKings and FanDuel lost key business partnerships during the trial. Citigroup blocked debit and credit card payments to DraftKings and FanDuel, citing legal uncertainties.[287] It seems as though Citigroup was uncertain how regulators would categorize DFS, which made continued business dealings risky.[288]

Finally, it is necessary to consider whether DraftKings and FanDuel were strategically brilliant or just lucky. DraftKings and FanDuel survived and, at times, thrived in hostile legal environments. However, the *Murphy* decision[289] was a pivotal event, which neither company could

---

[281] Eric Biber et al., *Regulating Business Innovations as Policy Disruption: From the Model T to Airbnb*, 70 VAND. L. REV. 1562, 1569 (2017).

[282] *See* Hayden Bird, *A DraftKings Founder Used the Terms 'Bet' & 'Casino' to Explain the Site in a Reddit AMA*, BOSTINNO (Oct. 18, 2015), https://www.americaninno.com/boston/a-draftkings-founder-used-the-terms-bet-casino-to-explain-site-in-a-reddit-ama/.

[283] *See* People by Schneiderman v. DraftKings, 453054/2015, Bain & Company Falcon Interim Update NYSCEF Doc No. 84 (filed Nov. 23, 2015).

[284] Lucinda Shen, *DraftKings and FanDuel Settle New York Lawsuit for $12 Million*, FORTUNE (Oct. 26, 2016), http://fortune.com/2016/10/26/draftkings-fanduel-settlement/.

[285] Lucinda Shen, *DraftKings and FanDuel Settle New York Lawsuit for $12 Million*, FORTUNE (Oct. 26, 2016), http://fortune.com/2016/10/26/draftkings-fanduel-settlement/.

[286] Emmett Knowlton, *One year after taking over the fantasy football world, DraftKings and FanDuel are reportedly running out of cash and can't pay their vendors*, BUS. INSIDER (Oct. 24, 2016), https://www.businessinsider.com/draftkings-and-fanduel-reportedly-running-out-of-cash-and-cant-make-payments-2016-10.

[287] Walt Bogdanich et al., *Fantasy Sites are Dealt New Rebuff by Citigroup*, N.Y. TIMES (Feb 5, 2016).

[288] Dan Adams et al., *Citigroup blocks customers in N.Y. from paying for fantasy sports*, BOSTON GLOBE (Feb 5, 2016), https://www.bostonglobe.com/business/2016/02/05/citigroup-blocks-draftkings-fanduel-transactions-state/KoXeKGBeeKyC8TdB7kpU1H/story.html.

[289] Murphy v. Nat'l Collegiate Athletic Ass'n, 584 U.S. ___(2018).

36

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

have predicted when starting out.[290] Both companies faced tremendous challenges in surviving until gambling was legalized. After the NYAG settlement, the companies were in a somewhat dire financial situation and this made accepting greater risk more tolerable.[291] As the companies were finding themselves short on cash flow due to legal troubles, the tolerance for risk increased, including offering contests that were facially non-compliant with UIGEA and operating in states where the contests had been declared illegal.[292] So while luck was clearly important, DraftKings and FanDuel should be credited with strategically, if aggressively, navigating gambling regulations since 2009, while setting themselves up to dominate a legal sports betting market that will grow as more states legalize sports betting.[293]

## C.    Legal Implications

Another consideration is to differentiate between two types of regulatory costs. The most frequently discussed cost to arbitrageurs is the ex-post cost of regulation.[294] Ex post costs are costs incurred because the regulatory system has categorized a business and enacted fees, taxes, fines, or other constraints based on that categorization.[295] Ex ante costs, on the other hand, are costs incurred while the regulatory system is deciding how to categorize the business, such as the costs of legal advice, legal proceedings, lobbying, marketing, reputational work, and product development.[296] DraftKings and FanDuel incurred few ex post costs because they avoided negative categorization, but they incurred ex ante costs due to the lawsuit in New York. Most importantly, regulators could have imposed substantial ex ante costs simply by enforcing gambling statutes. Even though the status of DFS was left unresolved by federal and most state courts, regulators could have made operation untenable for FanDuel and DraftKings had they chosen to enforce all statutes that were heretofore enforceable.[297] In other words, while the conversation centered on whether or not DraftKings and FanDuel would need to pay the ex post regulatory cost of being categorized as gambling, there was minimal acknowledgment that ex ante costs, by themselves, would have crippled the companies, if enforced.

---

[290] Despite growing interest in legalizing sports betting including calls for legalization from National Basketball Association commissioner Adam Silver, there was not a clear path forward for legalization until the Supreme Court ruled that PASPA unconstitutionally commandeered the New Jersey legislature, those allowing the state to legalize sports wagering. *See* Adam Silver, *Legalize and Regulate Sports Wagering*, N.Y. TIMES (Nov. 13, 2014), https://www.nytimes.com/2014/11/14/opinion/nba-commissioner-adam-silver-legalize-sports-betting.html.

[291] ASSOCIATED PRESS, *DraftKings and FanDuel Call Off Merger*, N.Y. TIMES (July 13, 2017), https://www.nytimes.com/2017/07/13/sports/draftkings-and-fanduel-call-off-merger.html.

[292] Daniel Roberts, *Are DraftKings and FanDuel Legal?*, FORTUNE (Sep. 24, 2015), http://fortune.com/2015/09/24/draftkings-fanduel-legal/.

[293] Ryan Rodenberg, *State-by-state sports betting bill tracker*, ESPN (Apr. 24, 2019), http://www.espn.com/chalk/story/_/id/19740480/gambling-sports-betting-bill-tracker-all-50-states.

[294] Pinar Ozcan & Kerem Gurses, *Playing Cat and Mouse: Contests over Regulatory Categorization of Dietary Supplements in the United States*, 61 ACAD. MGMT. 1789 (2018).

[295] *See* Peter J. Hammond, *Ex-ante and Ex-post Welfare Optimality Under Uncertainty,* 48 ECONOMETRICA 235 (1981).

[296] *See* Peter J. Hammond, *Ex-ante and Ex-post Welfare Optimality Under Uncertainty,* 48 ECONOMETRICA 235 (1981).

[297] *See* Marc Edelman, *Navigating the Legal Risks of Daily Fantasy Sports: A Detailed Primer in Federal and State Gambling Law*, 2016 U. ILL. L. REV. 117 (2016).

37

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

Of course, ex ante costs may be seen as an unappetizing, strong-arm tactic of big government if they are used to stop innovative businesses. But in the case of DraftKings and FanDuel, where there was a possibility that DFS would be classified as sports betting, enforcement, and therefore ex ante regulatory cost, was likely reasonable. But, such an enforcement calculus is not the same for all disruptive industries.

Uber and Lyft, and other ride share companies are perhaps one of the best contemporary examples of companies who engaged in a strategy-based partially on strategic "disregard" of the law in order to expand in jurisdictions where they faced a regulatory challenge, most often in cities with strong Taxi unions.[298] Despite the threat of ex ante regulatory costs Uber and Lyft pushed forward arguing that their disruptive business models granted greater freedom to consumers, and provided an alternative to taxi monopolies that had controlled cities since the 1920s.[299] Indeed, efforts to limit Uber and Lyft by governments in cities around the world have often been met with consumer uproar and protests arguing against the excessive regulation of services to which they became accustomed.[300] The ex ante costs associated with the disruption to the taxi industry brought on by the ride sharing community remain uncertain, while both Uber and Lyft have struggled to turn a profit, much like their DFS brethren they are looking out on a landscape where they have largely defeated the rival taxi industry in most major cities.[301] While by minimizing regulatory costs, they were able to undercut competitors prices and win substantial market share.[302]

Another example of companies disrupting conventional interpretations of the law are prescription medicine sites like Roman and Hers, that cater to consumers who know the brands of pharmaceuticals they want and allow consumers to obtain a prescription for lifestyle drugs, which they may be embarrassed to request in person.[303] Some sites are selling drugs for off-label uses like blood pressure medication to lower performance anxiety.[304] While innovative, the practice of prescribing drugs to a consumer without so much as taking a patient's vital signs is ethically questionable. Despite the uncertain legality of the practice, various competitors in the market have raised more than $100 million, much like their DFS brethren before them. If prescription sites react to enforcement similarly to the DFS industry, regulators could use ex ante costs to slow the

---

[298] Brishen Rogers, *The Social Costs of Uber*, 82 U. CHI. L. REV. DIALOGUE 85, 87 (2015).

[299] Brishen Rogers, *The Social Costs of Uber*, 82 U. CHI. L. REV. DIALOGUE 85, 87-88 (2015).

[300] *See e.g.*, Nicole Dungca, *Proposed Ban on Uber, Lyft at Convention Center Raises Worries*, BOSTON GLOBE (Apr. 19, 2016), https://www.bostonglobe.com/metro/2016/04/19/officials-irked-proposed-ban-uber-and-lyft-convention-center/w1vlIHUVxt6vGvxuqdPTGN/story.html.

[301] Cecilia Saixue Watt, *'There's No Future For Taxis': New York Yellow Cab Drivers Drowning In Debt*, THE GUARDIAN (Oct. 20, 2017), https://www.theguardian.com/us-news/2017/oct/20/new-york-yellow-cab-taxi-medallion-value-cost.

[302] Miranda Katz, *Why Are New York Taxi Drivers Killing Themselves?*, WIRED (Mar. 28, 2018), https://www.wired.com/story/why-are-new-york-taxi-drivers-committing-suicide/. (In an example of the human cost paid for aggressive business practices, numerous New York taxi drivers have committed suicide after taking on significant debt to purchase once prized taxi medallions, allowing them to drive in New York City, having seen the value plummet after the medallion-free ride share companies entered the market).

[303] Natasha Singer & Katie Thomas, *Drug Sites Upend Doctor-Patient Relations: 'It's Restaurant-Menu Medicine,'* N.Y. TIMES (Apr. 2, 2019), https://www.nytimes.com/2019/04/02/technology/for-him-for-hers-get-roman.html.

[304] Natasha Singer & Katie Thomas, *Drug Sites Upend Doctor-Patient Relations: 'It's Restaurant-Menu Medicine,'* N.Y. TIMES (Apr. 2, 2019), https://www.nytimes.com/2019/04/02/technology/for-him-for-hers-get-roman.html.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

ethically uncertain service while the regulatory system decides on how it should be categorized. At a minimum, regulators can learn from the DFS industry by following statements with consistent legal actions so as not to give an unfair advantage to well-resourced, risk tolerant companies. The downside of enforcement is that it is paid for by the public who should not be burdened by unlikely-to-succeed actions on behalf of regulators.

An additional strategy to avoid allowing companies to flout regulatory regimes is for legislators to enact laws against the licensing of bad actors in newly regulated markets. Allowing companies like FanDuel and DraftKings to emerge as leaders of the new market, while they showed utter disregard for various federal and state laws, is offensive to the principles of justice. Indeed, the suggestion that bad actors should not be allowed into the market is not new. In legislation drafted by Senators Orrin Hatch and Charles Schumer, a federal bill proposed denial of licensure for companies that had previously violated UIGEA.[305] Bad actor laws have been used in several regulated online gambling markets including Nevada, who instructs regulators "a former U.S. facing online gambling company that was operating in the U.S. without an appropriate license after a certain date must be automatically excluded."[306] Despite the desirability for regulators to exclude companies who have turned their noses up at existing laws, few states have chosen to legislate a ban on licensing companies who have been previously non-compliant. Outside of Nevada and the federal bill which did not pass, Illinois has been in the minority in proposing that:

"No sports wagering operator license or Internet sports wagering vendor license shall be granted to an applicant that has accepted, that has or had an affiliate that has accepted, or that has officers or directors who are or have been officers or directors of another party that accepted wagers through the Internet in contravention of any United States law, Illinois law, or any substantially similar laws of any other jurisdiction before the application date."[307]

The Illinois bad actor language is likely a direct response to the lack of respect FanDuel and DraftKings have shown since the state's Attorney General issued her opinion that DFS contests violated state gambling laws.[308] Bad actors are disqualified from other fields with some regularity,[309] and it is likely a testament to the marketing efforts of FanDuel and DraftKings, to

---

[305] Sports Wagering Market Integrity Act of 2018, S. 3793, 115th Cong. (2018). *See also* Steve Ruddock, *US Senator On Sports Betting Proposal: Bad Actors, Tainted Assets Need Not Apply*, ONLINE POKER REP. (Dec. 11, 2018), https://www.onlinepokerreport.com/33754/bad-actor-clause-sports-bill/.

[306] John Mehaffey, *The Online Gambling Bad Actor Debate*, US POKER (Aug. 16, 2013), https://www.uspoker.com/blog/the-online-gambling-bad-actor-debate/5515/.

[307] Heidi Specter, *Illinois May Get a "Bad Actor" Clause in Sports Betting Bill*, GAMBLING NEWS (Mar. 29, 2019), https://www.gamblingnews.com/news/illinois-may-get-a-bad-actor-clause-in-sports-betting-bill/.

[308] Dustin Gouker, *FanDuel, DraftKings File Motion To Dismiss Illinois Fantasy Sports Court Case…That They Started*, LEGAL SPORTS REP. (Mar. 7, 2018), https://www.legalsportsreport.com/18966/fanduel-draftkings-illinois-case/.

[309] *See e.g.,* Christopher K. Odinet, *Banks, Break-ins, and Bad Actors in Mortgage Foreclosure*, 83 U. CIN. L. REV. 1155 (2014).

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178

Forthcoming 57 American Business Law Journal ___ (2020).

create sufficient uncertainty as to the status of their DFS products, that more states have not included language that would preclude their participation in a legal market.

**Conclusion**

The ability for FanDuel and DraftKings to emerge from an exemption in an obscure banking statute to become the two most prominent gambling companies in the United States in under a decade is astonishing.[310] But, the two companies would almost certainly not exist today if not for their strategic categorization, as well as some luck in the face of their questionable early legal judgments. DraftKings and FanDuel skillfully told at least two different stories relatively simultaneously.[311] While FanDuel and DraftKings told lawmakers, lawyers, and judges that they were different from sports betting, they also told consumers and investors that they were similar to gambling.[312] In doing this successfully, the two companies have consequently emerged as the most powerful players in the sports gambling space within the United States—raising questions about the fundamental fairness of companies that use strategic categorization to avoid high regulatory costs, only to emerge into a nascent market with a substantial advantage over competitors who followed the law.

The challenge for lawmakers is that it is not possible to legislate against every possible activity, but it is possible to prevent bad actors from receiving permissive licenses, and in a regulated area such as sports wagering, this approach should be relatively easy to implement. A ban on bad actors would resolve one of the most difficult challenges facing lawmakers–passing effective legislation without having to have a crystal ball to foresee every possible activity.[313] Regulators can also proactively enforce laws to impose ex ante regulatory costs on firms. Ex ante regulatory costs may slow companies using obvious regulatory arbitrage strategies, but they may also cause public pushback and they could be accused of stifling innovation. While DraftKings and FanDuel deserve praise from a managerial and public relations perspective for creatively re-categorizing themselves with regularity to gain the benefits from being seen simultaneously as both "gambling" and "non-gambling," they still perhaps should face some legal sanctions to deter future entrepreneurs from similarly adopting a lax approach to legal compliance with the hopes of using creative categorization of dubious legal compliance as a business strategy for purposes of gaining market share.

---

[310] *See* 31 U.S.C. § 5362 (2006).

[311] Affidavit of Gregory B. Karamitis, Vice President of Analytics at DraftKings, Exhibit B, New York v. DraftKings, 453054/2015 (Filed Nov. 24, 2015). NYSCEF Doc. No. 102.

[312] *See supra* Section IV A-B.

[313] In the case of DFS, lawmakers did not envision anyone creating a product like DFS when they exempted certain fantasy games from UIGEA. Jim Leach, one of the driving forces behind UIGEA stated: "lawmakers had no idea daily fantasy sports would 'morph into today's cauldron of daily betting.'" Tim Dahlberg, *Former congressman says daily fantasy sports sites are a cauldron of daily betting*, PBS (Oct. 12, 2015), https://www.pbs.org/newshour/politics/former-congressman-says-daily-fantasy-football-sites-cauldron-daily-betting.

© 2019, Dr. John T. Holden, Dr. Christopher M. McLeod, & Professor Marc Edelman. This draft version of the article is intended solely for the purposes of publication review. Readers wishing to cite to this article should contact the authors at John.Holden@OkState.edu

Electronic copy available at: https://ssrn.com/abstract=3442178